**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| FEDEX CORPORATION<br>and SUBSIDIARIES<br>942 South Shady Grove Road<br>Memphis, Tennessee 38120<br><br>*Plaintiff,*<br>v.<br><br>UNITED STATES OF AMERICA,<br>c/o The Honorable William P. Barr<br>Attorney General of the United States of<br>America<br>950 Pennsylvania Ave, N.W.<br>Washington, D.C. 20530<br><br>c/o D. Michael Dunavant<br>United States Attorney's Office<br>167 North Main Street<br>Suite 800<br>Memphis, Tennessee 38103<br><br>*Defendant.* | Civil Case No. _____ |

**COMPLAINT**

## INTRODUCTION

1.       FedEx Corporation and Subsidiaries ("FedEx")[1] brings this suit to challenge a regulation issued by the Internal Revenue Service ("IRS") and the U.S. Department of the Treasury ("Treasury") that purports to replace clear legislative text with their preferred policy choice. This regulatory action is an attempt by administrative agencies to usurp legislative power in defiance of clear statutory limitations on their rulemaking authority, i.e., the text Congress wrote and approved. In this instance, that usurpation has resulted in overpayments of more than $89 million of tax by FedEx. The Supreme Court has mandated that the only way to remove the "agency fox" from the "legislative henhouse" is to "tak[e] seriously, and apply[] rigorously … statutory limits on agencies' authority." *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013). FedEx asks the Court to do so here.

2.       The Administrative Procedure Act ("APA") generally provides that a court must invalidate and set aside agency regulations that are contrary to statute or in excess of statutory authority (5 U.S.C. § 706(2)(C)), arbitrary or capricious (5 U.S.C. § 706(2)(A)), or procedurally defective (5 U.S.C. § 706(2)(D)). Here, the regulation in question relates to the foreign-tax-credit regime. *See* Treas. Reg. § 1.965-5(c)(1)(ii) (the "Final Rule"). The Internal Revenue Code provides taxpayers a credit for taxes paid overseas on income earned there. A basic tenet of the APA is that an agency cannot undo what Congress has done. Yet the Final Rule purports to eliminate a foreign tax credit granted by Congress for taxes that FedEx and its foreign affiliates actually paid. The Final Rule also is arbitrary and capricious: it exposes FedEx to increased tax on future transactions and treats FedEx worse than similarly situated taxpayers based solely on

---

[1] FedEx comprises FedEx Corporation and a group of its affiliated U.S. subsidiaries that filed a consolidated U.S. federal income tax return for FedEx's fiscal year ended May 31, 2018 ("FY18") and for its fiscal year ended May 31, 2019 ("FY19").

the structure of FedEx's foreign operations. In addition, the Final Rule is procedurally defective because the IRS and Treasury[2] failed to consider and respond to comments from at least six interested parties stating that Prop. Reg. § 1.965-5(c)(1)(ii) (the "Proposed Rule," which was substantively identical to the Final Rule) was invalid for several reasons. Moreover, the Final Rule is impermissibly retroactive because it purportedly applies to transactions that occurred before the enactment of the Code section at issue and more than a year before the Final Rule was published in the Federal Register. For all of these reasons, the Final Rule is invalid and must be set aside. Doing so will allow FedEx to use the foreign tax credits Congress authorized.

3.     In the 2017 Tax Cuts and Jobs Act ("TCJA")[3] Congress fundamentally changed how the U.S. taxed corporations, moving from a "worldwide" system in which all of a company's worldwide income was taxed to a "territorial" system whereby (subject to certain exceptions discussed below) only U.S. income is subject to tax in the U.S. To transition between the two, Congress imposed a new tax under section 965.[4] That "transition tax" targeted earnings

---

[2] Under 26 C.F.R. § 601.601(a)(1) (2020), "[t]he most important [tax] rules are issued as regulations and Treasury decisions prescribed by the Commissioner [of Internal Revenue] and approved by the Secretary [of the Treasury] or his delegate." IRS attorneys in the IRS Office of Chief Counsel prepare the regulations. *Id.*; I.R.M. pt. 32.1.6.1 (Aug. 2, 2018) ("The IRS Office of Associate Chief Counsel is solely responsible for drafting and preparing published guidance."). "After approval by the Commissioner, regulations and Treasury decisions are forwarded to the Secretary or his delegate for further consideration and final approval." 26 C.F.R. § 601.601(a)(1). Officials from both the IRS and Treasury sign final regulations. I.R.M. pt. 32.1.6 (Aug. 2, 2018). Accordingly, both the IRS and Treasury are involved in the process of preparing and issuing a Treasury Regulation.

[3] "An Act to provide for reconciliation pursuant to titles II and V of the concurrent resolution on the budget for fiscal year 2018," Pub. L. No. 115-97, 131 Stat. 2054 (Dec. 22, 2017).

[4] Unless otherwise indicated, all "section" or "Code" references are to the Internal Revenue Code of 1986, as amended (26 U.S.C.) (I.R.C.), and all "Treasury Regulation" or "Treas. Reg." references are to the Treasury Regulations (26 C.F.R.) issued under the Code. Appendix A contains a copy of some of the pertinent Code provisions at issue in this litigation. The TCJA subsequently amended these Code provisions, which were in effect at the time of the transactions at issue in this case.

that had been invested offshore—in subsidiaries called "controlled foreign corporations" or "CFCs" in the Code—and not returned to, or taxed in, the U.S. In essence, even though foreign tax had been paid on those foreign earnings, U.S. tax on those earnings had been "deferred"— i.e., not paid—until the passage of the TCJA. Under the section 965 transition tax, U.S. shareholders like FedEx had to pay a one-time tax on those deferred foreign earnings that had been invested in their CFCs (even though those earnings had not been returned to the U.S.).

4.      Congress recognized that not all of a U.S. taxpayer's offshore companies are profitable. Accordingly, the transition tax was computed by offsetting (i.e., subtracting one from the other) the negative earnings and profits of a taxpayer's foreign corporations (which were a valuable tax attribute) against the positive earnings and profits of other related foreign corporations, and then taxing the net amount. The amount of positive earnings and profits offset by the negative earnings and profits to arrive at that net number is called the "Offset Earnings" of a CFC.

5.      In section 965(b)(4)(A), Congress characterized those Offset Earnings as previously taxed income (or "PTI") only "for purposes of applying section 959." (Section 959 provided that certain amounts of the earnings and profits of foreign subsidiaries are treated as PTI.) Congress did not characterize Offset Earnings as PTI for purposes of the transition tax more broadly. It did not characterize Offset Earnings as PTI for purposes of all of the foreign-tax-credit provisions of the Code. Even though it did so for different rules in the very next subparagraph (section 965(b)(4)(B)), it did not characterize Offset Earnings as PTI for purposes of the entirety of the Code. Instead, Congress directed that Offset Earnings be characterized as PTI only "for purposes of applying section 959." Words, particularly words in highly technical laws like the Code, have meaning.

6.    PTI is a fundamental concept at the heart of the interaction between the foreign-tax-credit regime on the one hand, and the rules governing the taxation of a U.S. shareholder's foreign subsidiaries on the other. The latter set of rules is known colloquially to tax practitioners as "Subpart F" for the subpart of the Code in which those rules reside. As a general matter, these two sets of rules ensured that when CFC income was taxed under Subpart F, a U.S. shareholder could claim a credit for foreign taxes related to such income. Section 960(a)(3)[5] was the provision that provided credits for any foreign taxes paid on PTI that had not previously been claimed as a credit by the U.S. shareholder. Based on its plain language, section 960(a)(3) provided a credit for foreign taxes paid on Offset Earnings (when such earnings were brought back to the U.S.) because such earnings were characterized as PTI solely "for purposes of applying section 959" (and not for any other purposes) and because foreign taxes paid on those earnings had not been previously allowed as a credit.[6]

---

[5] Congress amended section 960 as part of the enactment of the TCJA. Pub. L. No. 115-97, § 14301(b), 131 Stat. 2221 (Dec. 22, 2017). New section 960 applies "to taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of United States shareholders in which or with which such taxable years of foreign corporations end." *Id.* at § 14301(d), 131 Stat. 2225. For U.S. federal income tax purposes, FedEx and its foreign subsidiaries are on a fiscal year that ends on May 31. Thus, old section 960 continued to apply to distributions that occurred on or before May 31, 2018. This includes the FY18 Distributions (defined and explained in paragraphs 38 through 44). A copy of old section 960 is included in the attached Appendix.

[6] As a simple example, consider a U.S. shareholder that wholly owns two CFCs. CFC1 has $1,000 of earnings and profits, on which it paid $250 in foreign taxes. CFC2 has negative earnings and profits (a deficit) of $500 and never paid any foreign taxes. For purposes of calculating the transition tax, CFC1's positive earnings (of $1,000) are reduced by CFC2's negative earnings (of $500) such that the U.S. shareholder's transition tax is based on the remainder ($500) of CFC1's positive earnings. The U.S. shareholder credits $125 (half) of the foreign taxes paid on that $500 of earnings. But CFC1 still has another $500 of earnings—the Offset Earnings—and another $125 of foreign taxes that were paid on those earnings. When CFC1 distributes that remaining $500 of earnings (i.e., the Offset Earnings), the U.S. shareholder is entitled to credit the remaining $125 in foreign taxes that CFC1 paid on those earnings.

7.      Congress did more than think about the foreign-tax-credit implications of the transition tax—it enacted specific rules and restrictions. Section 965(g) and other provisions placed limitations on the foreign tax credits associated with income taxed under the transition tax. Nothing in section 965(g) or the other provisions of the TCJA, however, removed the entitlement to foreign tax credits granted by section 960(a)(3) for foreign taxes paid on Offset Earnings.

8.      Dissatisfied with Congress's policy choice, the IRS and Treasury issued the Final Rule, which replaced clear legislative text with the IRS and Treasury's preferred policy choice to eliminate foreign tax credits that the Code expressly authorized.

9.      FedEx received distributions of Offset Earnings in the U.S. during FY18; FedEx's foreign subsidiaries had paid foreign taxes on those Offset Earnings. Accordingly, the Code provided FedEx a credit for the foreign taxes paid by its foreign subsidiaries on the Offset Earnings that were distributed to FedEx in FY18.

10.     FedEx would have challenged the validity of the Final Rule soon after the IRS and Treasury issued it, but this Circuit currently prohibits a pre-enforcement challenge to the validity of a tax regulation. *See CIC Servs. LLC v. United States*, 925 F.3d 247 (6th Cir. 2019), *cert. granted*, 140 S. Ct. 2737 (2020). Consequently, FedEx had to treat the Final Rule as valid on its original U.S. federal income tax returns and file refund claims reflecting the credits that Congress authorized but the IRS purported to eliminate. Because the Final Rule is invalid, FedEx asks this Court to set aside the Final Rule, determine that FedEx satisfied all of the requirements for the refunds requested for FY18 and FY19, and order the U.S. to refund the U.S. federal income tax overpayments attributable to the denial of foreign tax credits under the Final Rule.

## PARTIES

11.     FedEx Corporation is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 942 South Shady Grove Road, Memphis, Tennessee. FedEx Corporation is the common parent of a worldwide group of affiliates (the "FedEx Group"). FedEx Corporation and its affiliated U.S. subsidiaries ("FedEx" as previously defined) filed a consolidated U.S. federal income tax return for FY18 and for FY19.

12.     Defendant United States of America is the federal government formed under the Constitution of the United States of America with its capital in Washington, D.C.

## JURISDICTION AND VENUE

13.     FedEx brings this action to recover overpayments of U.S. federal income tax arising under the Code in the amounts of $145,578 for the taxable year beginning June 1, 2017, and ended May 31, 2018 (i.e., FY18), and $89,006,415 for the taxable year beginning June 1, 2018, and ended May 31, 2019 (i.e., FY19).

14.     FedEx also seeks a judgment by this Court that Treas. Reg. § 1.965-5(c)(1)(ii) (i.e., the Final Rule) is invalid under the APA, 5 U.S.C. § 706.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346(a)(1). Because this action also arises under the federal APA, 5 U.S.C. § 706, this Court has federal question jurisdiction under 28 U.S.C. § 1331. This Court has authority to grant the relief requested under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202.

16.     Venue is proper in the United States District Court for the Western District of Tennessee under 28 U.S.C. § 1402, as FedEx Corporation has its principal place of business in this district.

17.     The prerequisites to the suit in sections 6532 and 7422 have been satisfied.

## THE APPLICABLE LAW AND THE RULEMAKING PROCESS

### The Statutory Framework

18.     Historically, the United States taxed U.S. corporations on income earned anywhere in the world (i.e., worldwide taxation). Before the early 1960s, Congress chose not to currently tax foreign income earned abroad by foreign subsidiaries of U.S. corporations. Instead, income tax was due only when those foreign subsidiaries paid a dividend.

19.     In 1962, Congress implemented the Subpart F "anti-deferral" regime, which immediately taxed certain types of foreign income ("Subpart F income"). Once taxed, Subpart F income was characterized as PTI under section 959[7] and could be distributed to the U.S. shareholder without any additional U.S. tax.

20.     Congress had also established a tax credit for U.S. taxpayers that paid taxes to a foreign country (under section 901), and a tax credit for a U.S. shareholder for foreign income taxes paid by a foreign corporation owned in whole or part by the U.S. shareholder (under sections 902 and 960).[8] This foreign tax credit allowed U.S. taxpayers to reduce their U.S. tax liability based on any foreign taxes paid or deemed paid to a foreign country. Before the TCJA, CFCs combined their foreign taxes into a "pool." A U.S. taxpayer who was a shareholder of a CFC could claim credits from that pool when it included earnings relating to that tax pool in its U.S. taxable income. The income and the taxes did not need to be precisely related to each other; being in the same pool was sufficient.

21.     The foreign-tax-credit regime and the Subpart F regime worked together successfully for many years. Because the earnings included in Subpart F income were often

---

[7] A copy of old section 959 is included in the attached Appendix.

[8] A copy of old section 902 is included in the attached Appendix.

subject to foreign tax and *immediately* included in U.S. taxable income, section 960(a)(1) provided immediate creditability of those foreign taxes when there was an actual income inclusion under Subpart F. Section 960(a)(3) backstopped section 960(a)(1). As a catchall provision, section 960(a)(3) provided a credit for foreign taxes paid on a PTI distribution that had been taxed by a foreign country but was not previously deemed to have been taxed in the U.S. These two provisions ensured that foreign tax credits were always available to offset U.S. taxes.

22.    On December 22, 2017, the President signed the TCJA into law. The TCJA transitioned the U.S. from a worldwide taxation system to a partial "territorial" taxation system and provided rules (under section 965) for transitioning between the two systems.

23.    Section 965(a) generally imposed a one-time tax on foreign income that had not previously been taxed in the U.S. ("deferred foreign income"). It did this by increasing the taxpayer's Subpart F income by the amount of that taxpayer's deferred foreign income. In computing this "section 965(a) inclusion," section 965(b)(1) "offset" the negative earnings and profits of the taxpayer's CFCs against the positive earnings and profits of its other CFCs. That offset occurred by subtracting the negative earnings from the positive earnings. This net amount was the amount of deferred foreign income that was subject to the one-time tax under section 965(a).

24.    Under section 965(b)(4)(A), the positive earnings that were offset by the negative earnings (i.e., the Offset Earnings) were not actually included in the U.S. shareholder's income under section 951(a).[9] However, section 965(b)(4)(A) characterized Offset Earnings as PTI "for purposes of applying section 959" and section 959 provided that amounts included in income are not again included in income. The statute thus treated Offset Earnings as PTI ("section 965(b)

---

[9] A copy of old section 951 is included in the attached Appendix.

PTI") when the CFC distributed those earnings to the U.S. shareholder; consequently, Offset Earnings were not included in U.S. taxable income upon that distribution.

25.     This result makes sense. Congress was transitioning to a new system. It knew that companies had deferred income, losses, and foreign tax pools overseas. Section 965(b) allowed companies to offset the profits with the losses for purposes of calculating the transition tax. This simply permitted real losses to offset real income—a reasonable result.

26.     Because section 960(a)(1) applied only to amounts "included under section 951(a)," the foreign taxes paid on Offset Earnings remained available after the section 965 inclusion for future use as tax credits when those earnings were actually distributed to the U.S. This also makes sense. These foreign taxes were actually paid on Offset Earnings and the U.S. shareholder should get a credit in the future when they are brought into the U.S. taxing system. By definition, Offset Earnings were not amounts included in U.S. income. These two provisions reflect a policy choice that Congress made in the transition to the new tax system.

27.     Nothing in section 965 or in any other part of the Code disallows the credits for foreign taxes associated with Offset Earnings. When Congress intends to disallow foreign tax credits, it does so expressly. *See, e.g.*, sections 901(k), (l), and (m) (pre-TCJA provisions that generally disallowed foreign tax credits in certain circumstances). None of these credit-disallowing provisions applied to eliminate the credit for foreign taxes paid on Offset Earnings. Congress is equally explicit when it intends to limit credits. Section 904 limited the amount of foreign tax credits that can offset U.S. federal income tax liability in a given taxable year, and FedEx properly applied these limits in determining its utilization of foreign tax credits in FY18 and FY19. Collectively, these statutory provisions show that Congress knows how to disallow or limit credits when it wants to.

28.     Because no part of the Code disallowed the credits for foreign taxes associated with Offset Earnings, the normal foreign-tax-credit provisions of the Code that were effective at the time of the FY18 Distributions (described in paragraphs 38 through 44 below) continued to apply. Specifically, under section 960(a)(3), when the Offset Earnings were distributed to a U.S. shareholder, the U.S. shareholder could credit the foreign taxes associated with Offset Earnings, thus utilizing the valuable tax attribute that Congress had expressly left to the U.S. shareholder. The ability to use those credits encouraged companies to return earnings to the U.S., thereby achieving one of the primary goals of the TCJA.

### The Rulemaking Process and the Final Rule

29.     On August 1, 2018, the IRS and Treasury issued proposed regulations under section 965,[10] including Prop. Reg. § 1.965-5(c)(1)(ii) (i.e., the Proposed Rule). The Proposed Rule provided as follows:

> Foreign income taxes deemed paid by a domestic corporation under section 960(a)(3) with respect to a distribution of section 965(a) previously taxed earnings and profits or section 965(b) previously taxed earnings and profits include only the foreign income taxes paid or accrued by an upper-tier foreign corporation with respect to a distribution of section 965(a) previously taxed earnings and profits or section 965(b) previously taxed earnings and profits from a lower-tier foreign corporation. No credit is allowed under section 960(a)(3) or any other section for foreign income taxes that would have been deemed paid under section 960(a)(1) with respect to the portion of a section 965(a) earnings amount that is reduced under [section 965(b)].

30.     In the Preamble to the Proposed Section 965 Regulations, Treasury made the following statement regarding the Proposed Rule:

> [B]ecause section 965(b) previously taxed earnings and profits are treated as having been included in a United States shareholder's income under section 951(a), foreign income taxes that would have been deemed paid with respect to

---

[10] Guidance Regarding the Transition Tax Under Section 965 and Related Provisions, 83 Fed. Reg. 39514 (proposed Aug. 9, 2018) (to be codified at 26 C.F.R. pt. 1) (the "Proposed Section 965 Regulations").

section 965(b) previously taxed earnings and profits under section 960(a)(1) had such amounts actually been included in income are treated as having been deemed paid, with the result that no credit is allowed under section 960(a)(3) or any other provision of the Code for such taxes.[11]

31.     The following taxpayers, taxpayer representatives, and industry groups submitted at least six comment letters telling the IRS and Treasury that the Proposed Rule contradicted section 965(b)(4)(A) and section 960(a)(3); undermined the policy behind the foreign-tax-credit system; and ignored Congressional intent:

    a.  Tax Executives Institute, Inc. ("TEI")[12] (Comment Letter of Oct. 9, 2018);

    b.  Walgreens Boots Alliance, Inc. (Comment Letter of Oct. 9, 2018);

    c.  The Information Technology Industry Council[13] (Comment Letter of Oct. 7, 2018);

    d.  Baker & McKenzie LLP (Comment Letter of Oct. 5, 2018);

    e.  Hanesbrands, Inc. (Comment Letter of Oct. 4, 2018); and

    f.  U.S. Chamber of Commerce[14] (Comment Letter of Oct. 3, 2018).

32.     No commenter suggested that the Proposed Rule was valid or that Congress had granted to the IRS and Treasury the authority to override the Code.

---

[11] Guidance Regarding the Transition Tax, 83 Fed. Reg. at 39530.

[12] TEI is the leading corporate tax organization in the United States. It has nearly 7,000 members, aligned in 57 separate chapters, and represents over 2,800 of the largest businesses in the United States, Canada, Europe, and Asia.

[13] The Information Technology Industry Council represents the interests of the information and communications technology industry, including member companies that are among the global leaders in innovation.

[14] The U.S. Chamber of Commerce is the world's largest business organization representing companies of all sizes across every sector of the economy. Its members range from small businesses and local chambers of commerce to leading industry associations and large corporations.

33.     On October 18, 2018, only nine days after the comment period had closed, the Treasury Department's Deputy Assistant Secretary (International Tax Affairs) and Special Advisor on International Taxation publicly stated that, despite the comments submitted, their view of the validity of the Proposed Rule had not changed.

34.     On December 20, 2018, the staff of the Joint Committee on Taxation released the "General Explanation of Public Law No. 115-97 (JCS-1-18)," colloquially known as the "Blue Book." The Joint Committee staff wrote: "[I]t is intended that no deduction or credit is allowed for taxes associated with earnings and profits that, by reason of section 965(b), are not included in income." *Id.* at 362. The Blue Book further stated that "[a] technical correction may be needed to reflect this intent." *Id.* at 362 n.1695. The Blue Book shows that the text of the statute as enacted did not eliminate foreign tax credits on Offset Earnings, and that to impose a requirement like the one in the Final Rule, Congress needed to amend section 965—in other words, the Blue Book shows that the IRS and Treasury lacked the authority to impose such a requirement on their own.

35.     Some in Congress reached the same conclusion. On January 2, 2019, the former Chairman of the House Ways and Means Committee released a discussion draft of the "Tax Technical and Clerical Corrections Act" (the "Draft Technical Corrections Bill"). The Draft Technical Corrections Bill proposed to add new section 965(g)(5)—"Denial of foreign tax credit with respect to certain amounts treated as previously taxed income." Proposed section 965(g)(5) provided that "[n]o credit shall be allowed under section 901 for any taxes paid or accrued (or treated as paid or accrued) with respect to any amount described in subsection (b)(4)(A)." Thus, proposed section 965(g)(5) was essentially identical to the Final Rule. The Draft Technical Corrections Bill proposed to add a completely new substantive subsection to section 965 that was

noticeably absent from and contrary to the statutory text as enacted. To date, almost three years after the TCJA was enacted, Congress has not enacted this or any other "technical correction" to section 965 addressing this issue.

36.     On February 5, 2019, the IRS and Treasury published in the Federal Register "Regulations Regarding the Transition Tax Under Section 965 and Related Provisions," 84 Fed. Reg. 1838 (the "Final Section 965 Regulations"). These regulations included the Final Rule. The IRS and Treasury finalized the Proposed Rule without substantive amendment. The Final Rule provided as follows:

> Foreign income taxes deemed paid by a domestic corporation under section 960(a)(3) with respect to a distribution of section 965(a) previously taxed earnings and profits or section 965(b) previously taxed earnings and profits include only the foreign income taxes paid or accrued by an upper-tier corporation with respect to a distribution of section 965(a) previously taxed earnings and profits or section 965(b) previously taxed earnings and profits from a lower-tier foreign corporation. No credit is allowed under section 960(a)(3) or any other section for foreign income taxes that would have been deemed paid under section 960(a)(1) with respect to the portion of a section 965(a) earnings amount that is reduced under § 1.965-1(b)(2) or § 1.965-8(b).[15]

37.     The Final Section 965 Regulations provided that they would "generally apply beginning the last taxable year of a foreign corporation that begins before January 1, 2018, and with respect to a United States person, beginning the taxable year in which or with which such taxable year of the foreign corporation ends." 84 Fed. Reg. at 1868.

**FACTS SUPPORTING CLAIMS FOR RELIEF**

**The FY18 Distributions**

38.     In June 2017, the worldwide operations of TNT Express B.V. ("TNT Express"), an indirect wholly owned subsidiary of FedEx Corporation acquired in May 2016, were

---

[15] "Regulations Regarding the Transition Tax Under Section 965 and Related Provisions," 84 Fed. Reg. 1838, 1901 (Feb. 5, 2019).

significantly affected by the cyberattack known as NotPetya. The NotPetya cyberattack reduced FedEx Corporation's operating profit by an estimated $400 million in the first half of FY18, primarily from loss of revenue due to decreased shipments in the TNT Express network and incremental costs to restore information-technology systems. To provide additional liquidity in the U.S. following the NotPetya cyberattack, the FedEx Group engaged in the following transactions (collectively, the "FY18 Distributions"), which were treated as distributions.

39.     On October 20, 2017, Federal Express Holding (Netherlands) C.V. ("HoldCo CV"), a Netherlands partnership that was treated as a CFC for U.S. federal income tax purposes, distributed $156,966,430 by issuing a promissory note to Federal Express International (Netherlands) C.V. ("FP CV"), a Netherlands partnership that was treated as a partnership for U.S. federal income tax purposes. FP CV then assigned the promissory note to FedEx Corporation as payment of $156,966,430 of interest accrued on a prior note from FedEx Corporation to FP CV. (Promissory notes were used for administrative ease; cash transfers to satisfy the notes in these October 2017 transactions were made in November 2017.) These transactions, which constituted distributions to FedEx, are referred to as the "October 2017 Distributions."

40.     On May 31, 2018, FP CV sold all of its limited partnership interests in Federal Express International Financing (Netherlands) C.V. ("FinCo CV"), a Netherlands partnership treated as a CFC for U.S. federal income tax purposes, to HoldCo CV in exchange for $1,860,257,580, consisting of (i) $447,282,550 in cash and (ii) shares in HoldCo CV valued at $1,412,975,030. The cash consideration constituted a distribution to FedEx. These transactions are referred to as the "May 2018 Distributions."

41.     As a result of the FY18 Distributions, FedEx was treated as receiving $604,248,980 of earnings and profits excluded from income under section 959 in FY18. Of that $604,248,980, $263,168,456 was excluded from income under section 965(b)(4)(A), which characterized that $263,168,456 of earnings and profits as PTI for purposes of applying section 959. That $263,168,456 amount constituted Offset Earnings of FedEx in the context of the section 965 transition tax.

42.     Separately, section 960(a) (as in effect at the time of the FY18 Distributions) addressed the treatment of foreign taxes paid in association with FedEx's Offset Earnings. FedEx's CFCs had paid $232,904,450 of foreign taxes associated with FedEx's Offset Earnings included in the FY18 Distributions. That $232,904,450 of foreign taxes constituted creditable income taxes under sections 902 and 960; these provisions thus applied to the FY18 Distributions.

43.     Because section 960(a)(1) required an actual inclusion in income under section 951(a), and section 965 did not actually include Offset Earnings in income under section 951(a), section 960(a)(1) did not apply. Thus, FedEx had not previously claimed a credit for foreign taxes actually paid associated with FedEx's Offset Earnings included in the FY18 Distributions.

44.     Rather, under section 960(a)(3), when the FY18 Distributions were made to the U.S., FedEx was deemed to have paid $232,904,450 of foreign taxes on FedEx's Offset Earnings included in the FY18 Distributions, and FedEx was entitled to foreign tax credits in that same amount under section 902, which provided to certain U.S. shareholders a credit for foreign taxes paid by certain foreign corporations.

**FedEx's Tax Returns**

45.     On March 14, 2019, FedEx timely filed a Form 1120, U.S. Corporation Income Tax Return for FY18 (the "Original FY18 Tax Return").[16]

46.     FedEx's Original FY18 Tax Return claimed foreign tax credits in the amount of $211,331,158.

47.     On April 17, 2020, FedEx electronically filed a Form 1120-X, Amended U.S. Corporation Income Tax Return for FY18 (the "Amended FY18 Tax Return"). The IRS received the Amended FY18 Tax Return on April 17, 2020, as established in an Electronic Return Acknowledgment that FedEx received from the IRS on April 17, 2020.

48.     The Amended FY18 Tax Return shows taxable income of $746,387,668, which reflects an increase (relative to the Original FY18 Tax Return) of $13,188,022 for Subpart F deemed inclusions and partnership allocations, which increased income tax before credits by $3,851,986. The additional Subpart F inclusion resulted in additional taxes deemed paid. The Original FY18 Tax Return also overstated foreign tax credits with respect to certain entities in

---

[16] FedEx operates using a fiscal year tax year ending May 31 (a tax year ending on the last day of any month other than December), and thus, FedEx was required to file its FY18 Form 1120 U.S. Corporation Income Tax Return by the fifteenth day of the fourth month after the close of the fiscal year (September 15, 2018). Section 6072(a). A corporation, however, is entitled to an automatic extension of six months for filing its Form 1120 U.S. Corporate Income Tax Return, provided the corporation files an application on Form 7004 (Application for Automatic Extension of Time to File Corporation Income Tax Return) before the return due date. *See* section 6081(b); Treas. Reg. § 1.6081-3(a). When FedEx filed a Form 7004 for its FY18 tax year, FedEx's FY18 Form 1120 U.S. Corporation Income Tax Return due date was extended to March 15, 2019. By March 15, 2019, the IRS had not yet released a 2018 Form 1120 U.S. Corporation Income Tax Return. As a result, FedEx used the 2017 Form 1120 U.S. Corporation Income Tax Return to file its FY18 Form 1120 U.S. Corporation Income Tax Return. Similarly, FedEx used the 2018 Form 1120 U.S. Corporation Income Tax Return to file its FY19 Form 1120 U.S. Corporation Income Tax Return.

the Netherlands and the net tax liability (credit) under section 965 (as determined under section 965(h)(6)).[17]

49.     On its Amended FY18 Tax Return, FedEx redetermined its foreign-source income and accordingly increased foreign-source income by $210,325,427, including the additional Subpart F inclusion referenced in paragraph 48. Most of the additional foreign-source income was reclassified as a domestic loss; therefore, FedEx was able to increase its foreign tax credit by only $4,434,297. The Amended FY18 Tax Return claimed foreign tax credits in the amount of $215,765,455.

50.     On the Amended FY18 Tax Return, the general business credit was reduced by $436,733 as a result of the increased foreign tax credit and increased taxable income adjustments.

51.     As a result of the adjustments described in paragraphs 48 through 50, FedEx overpaid its FY18 taxes by $145,578. Accordingly, the Amended FY18 Tax Return claimed a refund of $145,578.

52.     Exhibit 1 contains the pages of the Amended FY18 Tax Return that describe the basis for the refund claim. Those statements are incorporated in this Complaint by reference.

53.     On March 5, 2020, FedEx timely filed a Form 1120, U.S. Corporation Income Tax Return for FY19 (the "Original FY19 Tax Return").

54.     FedEx's Original FY19 Tax Return claimed foreign tax credits in the amount of $167,496,358.

---

[17] The Amended FY18 Tax Return adjustments for the foreign-tax-credit overstatements partially offset by the additional taxes deemed paid from the Subpart F inclusion resulted in a net reduction of $24,572,539 to the foreign-tax-credit carryforward to FY19.

55.     On April 17, 2020, FedEx electronically filed a Form 1120-X, Amended U.S. Corporation Income Tax Return for FY19 (the "Amended FY19 Tax Return"). The IRS received the Amended FY19 Tax Return on April 17, 2020, as established in an Electronic Return Acknowledgment that FedEx received from the IRS on April 17, 2020.

56.     On FedEx's Original FY18 Tax Return and Original FY19 Tax Return, FedEx treated the Final Rule as if it were valid and paid the full amount of tax owed for FY18 and FY19 on that basis. FedEx did not claim any of the $232,904,450 of foreign tax credits on its Offset Earnings on its Original FY18 Tax Return or on its Original FY19 Tax Return. On FedEx's Amended FY18 Tax Return and Amended FY19 Tax Return, FedEx treated the Final Rule as being invalid. Because FedEx was not able to use any of the $232,904,450 of foreign tax credits on the Offset Earnings in FY18, FedEx carried the credits forward and claimed $145,521,685 of the $232,904,450 of foreign tax credits on the Amended FY19 Tax Return. Specifically, FedEx's Amended FY19 Tax Return claimed foreign tax credits in the amount of $288,445,504.

57.     Because the Final Rule is invalid, FedEx's FY19 tax liability was overstated, and therefore, FedEx overpaid its taxes on its Original FY19 Tax Return. Specifically, FedEx overpaid its FY19 taxes by $89,006,415. (The overpayment on the Amended FY19 Tax Return is less than the additional foreign tax credits claimed of $145,521,685 associated with FedEx's Offset Earnings due to the net reduction to the foreign-tax-credit carryforward of $24,572,539 on the Amended FY18 Tax Return, and a decrease to the general business credit of $31,942,731 as a result of the increased foreign tax credits claimed on the Amended FY19 Tax Return.)

58.     Exhibit 2 contains the pages of the Amended FY19 Tax Return that describe the basis for the refund claim. Those statements are incorporated in this Complaint by reference.

59.     Under section 6532, a taxpayer must wait at least six months from the date of filing the refund claim to file a refund suit. FedEx filed its Amended FY18 Tax Return and its Amended FY19 Tax Return on April 17, 2020. As of the date of this Complaint, the six-month period has expired. This refund suit is therefore timely filed within the requirements of the Code.

## The Administrative Procedure Act

### The Final Rule Exceeds the IRS and Treasury's Rulemaking Authority and Is Contrary to Statute.

60.     Under the APA, agency regulations are invalid and must be set aside to the extent they are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

61.     Courts review an agency's interpretation of a statute under the framework laid out in *Chevron U.S.A. Inc. v. Nat. Resources Def. Council*, 467 U.S. 837 (1984). Under *Chevron*'s two-step test, courts must invalidate and set aside regulations that are contrary to the underlying statute. *See, e.g.*, *Allen v. Sec'y of Health & Human Servs.*, 837 F.2d 267, 269 (6th Cir. 1988). Under *Chevron* step one, when a court "ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9. Only if the court has applied the traditional tools of statutory construction and determined that the statute is ambiguous does the court proceed to *Chevron* step two, which asks "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

62.     The Final Rule is contrary to the text of section 965(b)(4)(A) and thus fails *Chevron* step one.

63.     Section 965(b)(4)(A) provides that Offset Earnings are treated as having been included in income for only one limited purpose—"for purposes of applying section 959." The Final Rule attempts to override this plain language by substituting "for purposes of this title" in

place of the actual statutory text. When Congress intends for a particular provision to apply for all purposes, it says so specifically. Notably, Congress used that broader formulation—"for purposes of this title"—in section 965(b)(4)(B), the subsection of section 965 that immediately follows section 965(b)(4)(A).

64.     Further, Congress considered the precise question of how to treat foreign tax credits for purposes of section 965 in section 965(g), which expressly disallows a portion of the credits otherwise allowed against a section 965(a) inclusion. By describing how foreign tax credits apply under section 965, Congress demonstrated it was aware of, and had fully accounted for, the interaction between the transition tax and the foreign-tax-credit regime.

65.     Nothing in the legislative history suggests that Congress intended to effect the policy reflected in the Final Rule.

66.     The Final Rule is also inconsistent with the foreign-tax-credit system's purpose, which is to avoid double taxation faced by U.S. multinationals as a result of operating abroad. Because Offset Earnings are not exempt from U.S. taxation (as explained below), the foreign-tax burden faced by U.S. multinationals as a result of operating abroad is not fully offset without credits for foreign taxes paid on Offset Earnings. If such credits were denied, U.S. companies would be subject to taxation in both their country of residence and in the country from which the income is sourced. As a consequence, they would face a higher tax burden on foreign-source income than they would have faced had they been subject to tax in only one of the jurisdictions.

67.     Offset Earnings are subject to tax in the U.S. Specifically, Offset Earnings will be taxed upon distribution through the consumption of basis under section 961(b).[18] Under section

---

[18] Tax "basis" is often associated with the cost to buy an asset. For instance, if a taxpayer pays $50 for a share of stock, then that $50 is the taxpayer's basis in the stock. If the taxpayer subsequently sells the stock for $75, then that taxpayer is subject to U.S. federal income tax on

961(a), when a U.S. shareholder includes its CFC's Subpart F earnings in U.S. taxable income, the U.S. shareholder correspondingly increases its basis in the stock of the CFC to which the income relates. Under section 961(b), when the CFC subsequently distributes its Subpart F earnings as PTI, the U.S. shareholder decreases its basis in the stock of the CFC to the extent of the distribution. Section 961 thereby keeps in balance a U.S. shareholder's basis in the stock of a CFC so that the U.S. shareholder is not again taxed on the value of undistributed PTI if the CFC stock is sold. Because Offset Earnings are not actually included in income under section 951(a), a U.S. shareholder does not increase its basis in the relevant CFC's stock under section 961(a) by the amount of PTI created under section 965(b)(4)(A) (which the IRS and Treasury acknowledge). Nevertheless, when that CFC distributes Offset Earnings, the U.S. shareholder's basis in its stock is decreased under section 961(b) by the amount of PTI distributed. Thus, the creation and distribution of section 965(b) PTI only decreases the U.S. shareholder's basis in the CFC stock under section 961(b), thereby increasing gain (or decreasing loss) on a subsequent sale of that stock or on distributions  that exceed basis.

68.     Similarly, the Final Section 965 Regulations do not treat Offset Earnings as having been included in income under section 951(a) for purposes of applying section 986(c), which pertains to foreign-currency gain or loss on distributions of PTI. *See* Treas. Reg. § 1.986(c)-1(c). Again, if Offset Earnings were treated as having been included in income under section 951(a) for all purposes of the Code (as asserted by the IRS and Treasury), distributions of section 965(b) PTI would require recognition of foreign-currency gain or loss under section 986(c).

---

only the $25 difference between the "amount realized" of $75 and the basis of $50. Accordingly, basis is a valuable tax attribute because it can decrease taxable gain or increase taxable loss. A copy of old section 961 is included  in the attached Appendix.

69.     Further, as part of the overarching policy goal of encouraging companies to bring foreign earnings back to the U.S., Congress incentivized repatriation of section 965(b) PTI by structuring the transition tax to authorize credits for foreign taxes paid with respect to Offset Earnings only when the CFC distributes the section 965(b) PTI. The Final Rule eliminates this incentive for repatriation. Indeed, the Final Rule creates disincentives for such repatriation due to the net basis decrease caused by distributions of section 965(b) PTI—a result that undermines the foreign-tax-credit regime and the intentions of the TCJA.

70.     The Final Rule is also contrary to the text of section 960(a)(3). Section 960(a)(3), which applied to the FY18 Distributions, applied to "any" foreign taxes paid "on or with respect to the accumulated profits" that were "excluded from gross income under section 959(a)" as long as such taxes were not previously deemed paid by the domestic corporation. The plain text of section 960(a)(3) contradicted the IRS and Treasury's contention that the statute applied only to taxes (such as foreign withholding taxes) imposed on an upper-tier foreign corporation upon distributions of PTI from a lower-tier foreign corporation. Indeed, the term "any" indicates that section 960(a)(3) applied broadly to all distributions covered by its text. And the phrase "with respect to" shows that the foreign taxes paid needed to be only generally related to the accumulated profits that were distributed. The Final Rule's attempt to narrow the reach of section 960(a)(3) contradicts the plain statutory text.

71.     Based on the foregoing, the Final Rule is contrary to statute and in excess of statutory authority under 5 U.S.C. § 706(2)(C), and therefore must be set aside.

**The Final Rule Is Arbitrary, Capricious, an Abuse of Discretion,
or Otherwise Contrary to Law.**

72.     Under 5 U.S.C. § 706(2)(A), agency regulations must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."

73.     An agency regulation is arbitrary and capricious if the agency fails to provide a reasoned explanation for a regulation. 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).

74.     The Final Rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

75.     The IRS and Treasury failed to provide a reasoned explanation for the Final Rule. The IRS and Treasury's statements in the preamble to the Final Section 965 Regulations for rejecting requests for withdrawal of the Proposed Rule do not provide a reasoned explanation for the Final Rule. *See* 84 Fed. Reg. 1838, 1857-58 (Feb. 5, 2019).

76.     First, in the preamble to the Final Section 965 Regulations, the IRS and Treasury incorrectly assert that Offset Earnings are exempt from U.S. taxable income. 84 Fed. Reg. at 1857. They are not. As noted above, a distribution of section 965(b) PTI reduces basis under section 961(b), thereby creating increased gain (or decreased loss) on a subsequent sale or on a distribution in excess of reduced basis. Thus, credits for foreign taxes paid on Offset Earnings are necessary to avoid double taxation.

77.     Second, in the preamble to the Final Section 965 Regulations, the IRS and Treasury assert that foreign taxes on Offset Earnings were deemed paid under section 960(a)(1), resulting in those taxes not being available to be deemed paid again under section 960(a)(3). 84 Fed. Reg. at 1857. However, section 960(a)(1) provided a credit for foreign taxes paid only if an amount of foreign earnings "is included under section 951(a)(1)." Offset Earnings are not included in income under section 951(a); accordingly, section 960(a)(1) does not apply here. The IRS and Treasury cannot rewrite Code provisions. Nor can they substitute their policy choice for that of Congress. Under section 965(b)(4)(A), Offset Earnings are treated as PTI solely "for purposes of applying section 959," and not for purposes of mandating an inclusion in income

24

under section 951(a). What this means under the Code as written and approved by Congress is that a credit is allowed under section 960(a)(3) and not under section 960(a)(1).

78.     In the alternative, in response to the IRS and Treasury's second assertion, if the IRS and Treasury are correct that Offset Earnings should be treated as having resulted in foreign taxes deemed paid under section 960(a)(1), then such foreign taxes deemed paid would have been creditable under section 901. If so, then FedEx is entitled to a refund of $89,006,415 under section 960(a)(1). The IRS and Treasury's fiction of deeming foreign taxes on Offset Earnings as paid under section 960(a)(1), while simultaneously disallowing foreign tax credits for those deemed-paid foreign taxes, highlights the arbitrariness of the IRS and Treasury's statements in the preamble to the Final Section 965 Regulations and their position more broadly.

79.     Third, in the preamble to the Final Section 965 Regulations, the IRS and Treasury assert that section 960(a)(3) cannot be applied independently of section 959 and therefore sections 951 and 960(a)(1) apply. 84 Fed. Reg. at 1857. That is incorrect. Section 965(b)(4)(A) bypasses section 951(a) and excludes Offset Earnings from income under section 959(a). Section 960(a)(1) also does not apply to Offset Earnings. Section 960(a)(1) applies only to amounts actually "*included* in income under section 951(a)." (Emphasis added.) But Offset Earnings are not actually included in income under section 951(a). If they were, then credits on Offset Earnings would have been immediately available on the application of the section 965 transition tax. Instead, foreign tax credits arise only when Offset Earnings are distributed from a foreign subsidiary to its U.S. shareholder. Because section 960(a)(1) does not apply, that leaves section 960(a)(3) to determine whether credits for foreign taxes paid on Offset Earnings are available. Section 960(a)(3) applies to "[a]ny portion of a distribution from a foreign corporation received by a domestic corporation which is *excluded from gross income under section 959(a).*"

(Emphasis added.) Section 965(b)(4)(A) provides that Offset Earnings constitute PTI under section 959(a)—i.e., section 965(b)(4)(A), *on its own*, excludes Offset Earnings from gross income under section 959(a). Consequently, section 960(a)(3) provides a credit for foreign taxes paid on Offset Earnings.

80.     Fourth, the IRS and Treasury assert that credits related to Offset Earnings are used only to offset other unrelated foreign-source income because Offset Earnings are not subject to U.S. tax. 84 Fed. Reg. at 1857. However, Offset Earnings are in fact taxed through the utilization of deficits (a valuable tax attribute) under section 965(b), and section 965(b) PTI is further taxed via capital gain or through the consumption of basis under section 961(b). Allowing credits on Offset Earnings is the only way to prevent double taxation and make taxpayers whole.

81.     The IRS and Treasury's additional assertions in the preamble to the Final Section 965 Regulations are also without merit.

82.     An agency rule is arbitrary and capricious if it treats similarly situated entities differently without reasoned explanation. *Good Fortune Shipping SA v. Commissioner*, 897 F.3d 256, 264-65 (D.C. Cir. 2018); *Burlington N. & Santa Fe. Ry. v. Surface Transportation Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").

83.     In addition to the IRS and Treasury's statements in the preamble to the Final Section 965 Regulations as to why they did not withdraw the Proposed Rule, the IRS and Treasury failed to provide a reasoned explanation for treating similarly situated taxpayers differently under the Final Rule. First, the Final Rule discriminates against a U.S. taxpayer that chose to operate through a CFC rather than through a foreign branch. That discriminatory

treatment is due to the fact that a U.S. taxpayer that chose to operate through a foreign branch is deemed to pay 100% of the foreign taxes imposed on the branch, and is thus entitled to credits for the taxes paid. In contrast, a U.S. taxpayer that chose to operate through a CFC is entitled to only a portion of the CFC's foreign tax credits as a result of section 965. Second, the Final Rule imposes a disproportionate burden on taxpayers with high-taxed foreign earnings by forcing taxpayers with such earnings to bear a disproportionate amount of the cost of transitioning to a new tax system for international income under the TCJA.

84.     Based on the foregoing, the Final Rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A), and therefore must be set aside.

### The IRS and Treasury Violated the APA's Notice-and-Comment Rulemaking Requirements in Promulgating the Final Rule.

85.     Under 5 U.S.C. § 706(2)(D), agency regulations must be set aside if they were promulgated "without observance of procedure required by law." The APA requires an agency to provide notice and an opportunity to comment before the agency can implement rules that have the force and effect of law. 5 U.S.C. § 553.

86.     In promulgating the Final Rule, the IRS and Treasury did not comply with the notice-and-comment rulemaking requirements of 5 U.S.C. § 553. Consequently, the IRS and Treasury issued the Final Rule without observance of procedure required by law under 5 U.S.C. § 706(2)(D).

87.     At no point in the rulemaking process did the IRS and Treasury give real and meaningful consideration to alternative views from interested parties.

88.     The IRS and Treasury reached a conclusion about the Proposed Rule before they received a single comment.

89.     While the IRS and Treasury purported to welcome comments to the Proposed Rule, only nine days after the comment period closed, senior Treasury officials stated that their views about the Proposed Rule had not changed as a result of the comments. Those statements show that the comment process was an empty formality.

90.     In addition, the IRS and Treasury failed to address the comments that interested parties made regarding how the Proposed Rule was contrary to the plain text of the Code. An agency must respond to comments that challenge a fundamental premise. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment.").

91.     Adding insult to injury, the IRS and Treasury also purported to make the Final Rule retroactive "beginning the last taxable year of a foreign corporation that begins before January 1, 2018, and with respect to a United States person, beginning the taxable year in which or with which such taxable year of the foreign corporation ends." 84 Fed. Reg. at 1868. The only authority the IRS and Treasury cited was section 7805(b)(2). But that section does not *grant* affirmative authority to make a regulation retroactive. Instead, it applies only if the IRS and Treasury otherwise have retroactive rulemaking authority; if so, then the IRS and Treasury can issue a rule that relates back to the date of the statute as long as the IRS and Treasury issue the rule within 18 months of the enactment of the statute. The IRS and Treasury's attempt to fiat retroactivity contradicts the APA, which generally requires that a regulation cannot be effective until 30 days after the final rule is published in the Federal Register. 5 U.S.C. § 553(d). Because the IRS and Treasury were not authorized to apply the Final Rule retroactively, and because the APA precluded the Final Rule from taking effect until 30 days after February 5, 2019 (when the

28

IRS and Treasury issued the Final Rule), the IRS and Treasury cannot apply the Final Rule to the transactions at issue here, all of which occurred before February 5, 2019.

92.   Based on the foregoing, the Final Rule is procedurally defective under 5 U.S.C. § 706(2)(D), and therefore must be set aside.

## COUNT I

### FY18 Refund

93.   The allegations set forth in paragraphs 1 through 92 above are incorporated by reference in this Count I.

94.   FedEx made a full payment of U.S. federal income tax for FY18. *See* 28 U.S.C. § 1346(a)(1); *Flora v. United States*, 362 U.S. 145, 150, 177 (1960).

95.   FedEx properly treated the Final Rule as invalid on the Amended FY18 Tax Return.

96.   The Amended FY18 Tax Return correctly reflects the tax owed by FedEx for FY18 pursuant to the Code.

97.   FedEx's claim for refund for FY18 was made in proper form. *See* Treas. Reg. § 301.6402-3(a)(2).

98.   The Amended FY18 Tax Return was a timely filed refund claim under section 6511.

99.   This action is timely commenced within the applicable period of limitations under section 6532(a).

100.   The Amended FY18 Tax Return resulted in an overpayment of tax for FY18 in the amount of $145,578. FedEx demands a refund of this amount.

## COUNT II

### FY19 Refund

101.    The allegations set forth in paragraphs 1 through 100 above are incorporated by reference in this Count II.

102.    FedEx made a full payment of U.S. federal income tax for FY19. *See* 28 U.S.C. § 1346(a)(1); *Flora*, 362 U.S. at 177.

103.    FedEx properly treated the Final Rule as invalid on the Amended FY19 Tax Return.

104.    The Amended FY19 Tax Return correctly reflects the tax owed by FedEx for FY19 pursuant to the Code.

105.    FedEx's claim for refund for FY19 was made in proper form. *See* Treas. Reg. § 301.6402-3(a)(2).

106.    The Amended FY19 Tax Return was a timely filed refund claim under section 6511.

107.    This action is timely commenced within the applicable period of limitations under section 6532(a).

108.    The Amended FY19 Tax Return resulted in an overpayment of tax for FY19 in the amount of $89,006,415.  FedEx demands a refund of this amount.

## REQUEST FOR RELIEF

WHEREFORE, FedEx respectfully requests the following relief:

A.      A judgment by the Court that, under 5 U.S.C. § 706(2)(C), the Final Rule is in excess of statutory jurisdiction, authority, or limitations, and is therefore invalid;

B.      A judgment by the Court that, under 5 U.S.C. § 706(2)(A), the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and is therefore invalid;

C.      A judgment by the Court that the Final Rule did not comply with the notice-and-comment rulemaking requirements of 5 U.S.C. § 553, was without observance of procedure required by law under 5 U.S.C. § 706(2)(D), and is therefore invalid;

D.      A judgment by the Court in favor of Plaintiff and against the Defendant in the amount of $145,578 (identified as an overpayment of taxes on the Amended FY18 Tax Return), plus interest, or such greater amount as the Court may determine, be determined and held satisfied;

E.      A judgment by the Court in favor of Plaintiff and against the Defendant in the amount of $89,006,415 (identified as an overpayment of taxes on the Amended FY19 Tax Return), plus interest, or such greater amount as the Court may determine, be determined and held satisfied; and

F.      Any other legal or equitable relief to which FedEx is justly entitled and which the Court deems proper.

Respectfully submitted,

/s/Joseph B. Judkins

JOSEPH B. JUDKINS
  Tennessee Bar No. 033183
  joseph.judkins@bakermckenzie.com
  Attorney of Record
GEORGE M. CLARKE
  D.C. Bar No. 480073
  george.clarke@bakermckenzie.com
**BAKER & MCKENZIE LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006
Tel:    (202) 452-7000
Fax:    (202) 452-7074

CAMERON C. REILLY
  Illinois Bar No. 6321364
  cameron.reilly@bakermckenzie.com
**BAKER & MCKENZIE LLP**
300 East Randolph Street, Suite 5000
Chicago, IL 60601
Tel:    (312) 861-8000
Fax:    (312) 861-2899

RICHARD R. ROBERTS
  Tennessee Bar No. 015008
  rrroberts2@fedex.com
  Tel:  (901) 434-8575
  Fax:  (901) 434-4523
**FEDEX EXPRESS**
3620 Hacks Cross Road
Building B, 3rd Floor
Memphis, TN 38125

Attorneys for Plaintiff,
        FedEx

Dated: November 2, 2020

32