## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

_____
                                  )

FEDEX CORPORATION                   )
and SUBSIDIARIES                    )
                                  )
                     *Plaintiff*,      )
               v.                     )
                                  )
UNITED STATES OF AMERICA,         )      Civil Case No. 2:20-cv-02794
                                  )      The Honorable Samuel H. Mays, Jr.
                     *Defendant*.    )
_____ )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

MOTION FOR PARTIAL SUMMARY JUDGMENT.................................................. 1

MEMORANDUM OF LAW ........................................................................................ 1

INTRODUCTION ...................................................................................................... 1

ANALYSIS.................................................................................................................. 4

I.   The Statutory Framework. ................................................................................ 4

II.  The Code Unambiguously Foreclosed The Agencies' Attempt to Disallow Credits for Foreign Taxes Actually Paid and Properly Claimed.................... 7

   A.   The Code's Foreign-Tax-Credit Framework Allowed Credits on Offset Earnings........ 7

   B.   The TCJA Expressly Disallowed Certain Foreign Tax Credits, But Not Credits on Offset Earnings.................................................................................. 9

   C.   The Code's Rulemaking Grants Don't Provide Authority for the Final Rule. ............. 12

III. The Final Rule Is Contrary to Statute. ........................................................... 15

   A.   The Final Rule Suffers From Five Fundamental Errors. .............................. 15

      1. First, the Agencies Ignore the Limiting Opening Phrase of §965(b)(4)(A). ........... 15

      2. Second, the Agencies Disregard the Netting Rules in §965(b). .............................. 17

      3. Third, §965 Does Not Treat Foreign Taxes Paid on Offset Earnings as Having Been Deemed Paid Under §960(a)(1). .................................................. 18

      4. Fourth, the Agencies Mistakenly Conclude That Something That Is True of a Part Must Be True of the Whole. .................................................. 20

      5. Fifth, the Agencies Erroneously Contend that §960(a)(3) Applied Only to Withholding Taxes................................................................................. 21

   B.   Another Federal District Court Rejected the Exact Same Arguments the Agencies Made Regarding the Final Rule.................................................... 23

   C.   Ultimately, the Final Rule Is Nothing More Than the Agencies' Attempt to Substitute Their Policy Preference for Congress's.................................... 24

IV.  Treasury Failed to Respond to Comments That the Final Rule Was Invalid. ................. 26

V.   Congress Did Not Disallow Hundreds of Millions of Dollars of Credits by Obscure Implication. ...................................................................................... 30

CONCLUSION.......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022) ................................................................. 14

*American Chicle Co. v. United States*, 316 U.S. 450 (1942) ........................................................ 1

*Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008) ............................................. 16

*Biden v. Texas*, 2022 U.S. LEXIS 3269 (June 30, 2022) ............................................................ 16

*Brown v. Gardner*, 513 U.S. 115 (1994) .................................................................................... 12

*Burnet v. Chicago Portrait Co.*, 285 U.S. 1 (1932) ...................................................................... 4

*Busey v. Deshler Hotel Co.*, 130 F.2d 187 (6th Cir. 1942) ........................................................... 7

*Cent. Forwarding, Inc. v. Interstate Com. Comm'n*, 698 F.2d 1266 (5th Cir. 1983) ............. 12, 15

*Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70 (D.C. Cir. 2016) .......................................... 25

*Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ................................................. 7, 10, 15

*Clark Reg'l Med. Ctr. v. HHS*, 314 F.3d 241 (6th Cir. 2002) ...................................................... 10

*Commissioner v. Acker*, 361 U.S. 87 (1959) ............................................................................... 13

*Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123 (2d Cir. 2001) ................................ 22

*Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117 (2016) ...................................................... 27

*Gen. Chem. Corp. v. United States*, 817 F.2d 844 (D.C. Cir. 1987) ........................................... 29

*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) ..................................... 17

*Gitlitz v. Commissioner*, 531 U.S. 206 (2001) ........................................................................... 25

*Gomez-Perez v. Potter*, 553 U.S. 474 (2008) ............................................................................ 12

*Good Fortune Shipping SA v. Commissioner*, 897 F.3d 256 (D.C. Cir. 2018) ............................ 15

*Gulf Fishermens Ass'n v. NMFS*, 968 F.3d 454 (5th Cir. 2020) .................................................. 30

*HBO, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977) ......................................................................... 27

*Hughes v. McCarthy*, 734 F.3d 473 (6th Cir. 2013) .................................................................. 16

ii

*Ingersoll-Rand Co. & Subs. v. United States*, No. 3:16-cv-289 (W.D.N.C.) ............ 11, 23, 24, 25

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ................................................................. 22

*Knight v. Commissioner*, 552 U.S. 181 (2008) ................................................................ 21

*Koshland v. Helvering*, 298 U.S. 441 (1936) .............................................................. 7, 13

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ..................................................... 7

*Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014) ............................................................. 30

*Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129 (1936) ............................ 13

*Michigan v. EPA*, 576 U.S. 743 (2015) .......................................................................... 14

*Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134 (9th Cir. 2015) ...................... 29

*Nat'l Wildlife Fed'n v. Dep't of Transp.*, 960 F.3d 872 (6th Cir. 2020)................................ 13, 30

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) .............................................................. 21

*NYSE v. SEC*, 962 F.3d 541 (D.C. Cir. 2020)................................................................ 12

*Perez v. Cuccinelli*, 949 F.3d 865 (4th Cir. 2020) ........................................................ 28

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)..................................................... 27

*Reid v. Memphis Publ'g Co.*, 521 F.2d 512 (6th Cir. 1975) ......................................... 13

*Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ............... 20

*Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001) ................................... 9

*Rotkiske v. Klemm*, 140 S. Ct. 355 (2019) ..................................................................... 21

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ................................................................... 28

*Stanovsek v. Holder*, 768 F.3d 515 (6th Cir. 2014) ...................................................... 16

*Summa Holdings, Inc. v. Commissione*r, 848 F.3d 779 (6th Cir. 2017) ......................... 7

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)..................................................................... 22

*United States v. Calamaro*, 354 U.S. 351 (1957) ................................................ 7, 13, 24

*United States v. Gonzales*, 520 U.S. 1 (1997)................................................................ 22

*United States v. Woods*, 571 U.S. 31 (2013).................................................................. 26

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014 ...................................................... 9, 22, 24

*West Virginia v. EPA*, 2022 U.S. LEXIS 3268 (June 30, 2022).................................................. 30

*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................................................... 17

**Statutes**

5 U.S.C. §706............................................................................................................................ 4, 7, 15

26 U.S.C. §11 ..................................................................................................................................... 9

26 U.S.C. §165 ................................................................................................................................... 9

26 U.S.C. §245A ......................................................................................................................... passim

26 U.S.C. §901 ........................................................................................................................... passim

26 U.S.C. §902 ........................................................................................................................... passim

26 U.S.C. §904 ........................................................................................................................... passim

26 U.S.C. §911 ................................................................................................................................. 25

26 U.S.C. §951 ........................................................................................................................... passim

26 U.S.C §959 ............................................................................................................................. passim

26 U.S.C. §960 ........................................................................................................................... passim

26 U.S.C. §965 ........................................................................................................................... passim

26 U.S.C. §986 ................................................................................................................................. 29

26 U.S.C. §1502................................................................................................................................. 9

26 U.S.C. §7805......................................................................................................................... passim

Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 (Dec. 22, 2017) ...................... passim

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348 (Mar. 23, 2018)... 26

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar.
27, 2020) ...................................................................................................................................... 26

Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (1984) .................................... 23

Revenue Act of 1862, Pub. L. No. 37-119, 12 Stat. 432 (July 1, 1862) ....................................... 13

Revenue Act of 1918, Pub. L. No. 65-254, 40 Stat. 1080 (Feb. 24, 1919).....................................4

War Revenue Act of 1917, Pub. L. No. 65-50, 40 Stat. 300 (Oct. 3, 1917)..................................13

**Regulations**

Treas. Reg. §1.921-1T ...............................................................................................23

Treas. Reg. §1.964-1 ...................................................................................................22

Treas. Reg. §1.965-2 ...................................................................................................25

Treas. Reg. §1.965-5 ..............................................................................................passim

**Other Authorities**

Proposed Section 965 Regulations: Guidance Regarding the Transition Tax Under Section 965 and Related Provisions, 83 Fed. Reg. 39514 (Aug. 9, 2018)......................................................28

Final Section 965 Regulations: Regulations Regarding the Transition Tax Under Section 965 and Related Provisions, 84 Fed. Reg. 1838 (Feb. 5, 2019) ......................................................passim

Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders ...........................7

Carol P. Tello & Hyowon Lee, The Importance of Understanding the Section 965 Calculations, 91 Tax Notes Int'l 1311 (Sept. 24, 2018) ...............................................................10

Staff of the Joint Committee on Taxation, General Explanation of Public Law No. 115-97 (JCS-1-18)......................................................................................................25, 26

H.R. Rep. No. 115-409 (2017)...........................................................................10, 14

H.R., Tax Technical and Clerical Corrections Act Discussion Draft (Jan. 2, 2019) ...................26

Kuntz, Peroni & Bogdanski, U.S. International Taxation .......................................................11

President's Remarks at Signing of TCJA (Dec. 22, 2017) ..........................................................14

Webster's II New College Dictionary (3d ed. 2005) ..........................................................13, 14

## MOTION FOR PARTIAL SUMMARY JUDGMENT

FedEx Corporation & Subsidiaries ("Plaintiff") respectfully moves this Court under Federal Rule of Civil Procedure 56 to enter partial summary judgment that Treas. Reg. §1.965-5(c)(1)(ii)[1] (the "Final Rule") is invalid. There are no genuine issues as to any material fact and Plaintiff is entitled to judgment as a matter of law.[2] Plaintiff believes that oral argument would be helpful to the Court given the interaction of several technical tax statutes and related regulations.

## MEMORANDUM OF LAW

## INTRODUCTION

In addition to significant U.S. operations, FedEx conducted its transportation, e-commerce, and other business operations in many foreign countries, often through foreign subsidiaries. Some of these subsidiaries were profitable, others lost money. The profitable entities paid hundreds of millions of dollars of foreign taxes on their earnings. Consistent with the text and purpose of the 2017 Tax Cuts and Jobs Act ("TCJA"),[3] FedEx's foreign subsidiaries brought home $156 million of this foreign-earned cash in October 2017 and another $447 million in May 2018 (the "FY18 Distributions"). That money was used, among other things, to pay employee bonuses, fund its employee pension plan, and buy new planes. Bustamante Decl. ¶¶11-26, Ex. 1. The plain text of the Internal Revenue Code provided a U.S. tax credit for the foreign taxes paid on these foreign earnings. *American Chicle Co. v. United States*, 316 U.S. 450, 450 (1942) (the Code "allows a tax credit to domestic corporations in respect of income received from foreign subsidiaries").

---

[1] Unless otherwise stated, all "section" or "§" references are to the Internal Revenue Code of 1986, as amended and in effect for the tax year at issue (the "Code").

[2] Pertinent facts are set forth in the Joint Statement of Undisputed Facts. The Joint Appendix ("JA") contains pertinent excerpts from the administrative record for the section 965 regulations, 84 Fed. Reg. 1838 (Feb. 5, 2019).

[3] Pub. L. No. 115-97, 131 Stat. 2054 (Dec. 22, 2017).

The TCJA fundamentally changed the way the United States taxed foreign operations of U.S. companies. To transition from the old way to the new way, that law imposed a "transition tax" in §965. To calculate that tax, §965 netted the earnings of the historically profitable foreign subsidiaries with the losses of the historically loss-making foreign subsidiaries. In this way, the losses "offset" or reduced the amount of positive earnings subject to the transition tax. The positive earnings that were offset by the losses are called "Offset Earnings."[4] The Code provided a credit for foreign taxes paid on *all* foreign earnings brought back to the U.S., including Offset Earnings. Congress did not disallow credits on Offset Earnings. Instead, Congress specifically limited credits on foreign earnings under the transition tax, disallowing a precise amount of credits by using a clear statutory formula in §965(g). Despite the mathematical precision in the statute and the care that Congress took in identifying the full scope of credits to be disallowed, Treasury and the IRS (the "Agencies") promulgated the Final Rule, which purported to disallow credits for foreign taxes paid on Offset Earnings—credits that the statute left intact.

The Agencies' basis for the Final Rule rests entirely on the assumption that Offset Earnings were included in U.S. taxable income. They weren't. The Agencies insist that §965(b)(4)(A) expansively treats Offset Earnings as having been included in income for purposes of the entire Code, including §§951 and 960(a)(1), and thus credits on Offset Earnings should be disallowed. But Congress explicitly limited the scope of §965(b)(4)(A) to apply only "[f]or purposes of applying section 959," the statute that classifies earnings as previously taxed income. Through that precise statutory text, Congress drew a direct definitional line from §959 to §960(a)(3), the statute that provides a credit for foreign taxes paid on earnings classified as previously taxed income under

---

[4] The Final Rule sometimes refers to the Offset Earnings as "section 965(b) previously taxed earnings and profits," which are sometimes also called "section 965(b) PTEP" or "section 965(b) PTI."

§959.

Congress did not at any point actually include Offset Earnings in U.S. taxable income under §951. If it had, the foreign taxes paid on those earnings would be creditable under a different provision of §960, §960(a)(1). Remarkably, the Agencies concede all of this. They admit that the earnings were "never ... actually included in U.S. taxable income," but nonetheless argue that the foreign taxes on Offset Earnings were "treated as deemed paid" as part of the transition tax (even though they don't give a foreign tax credit under §960(a)(1) either). 84 Fed. Reg. 1838, 1857. The Agencies reach this result by ignoring the scope limitation of §965(b)(4)(A), which makes clear that Offset Earnings are treated as included in income only "[f]or purposes of applying section 959." Because the Offset Earnings were not actually included in U.S. taxable income, and because foreign taxes on those earnings were not deemed to have been paid at any time before the FY18 Distributions, there was no event prior to those distributions that would have allowed FedEx to claim a credit for the foreign taxes that its foreign subsidiaries paid. The Final Rule thus attempts to entirely eliminate the Code's grant of tax credits for foreign taxes paid on Offset Earnings (as carefully adjusted by Congress in the TCJA).

To put a finer point on it, the Final Rule is invalid for at least three reasons. First, it disallows foreign tax credits that the Code unambiguously authorizes. Bedrock principles of administrative law prevent a federal agency from usurping Congress's legislative power through regulations that contradict clear legislative text and exceed clear statutory limitations. Second, Treasury based the Final Rule on the flawed legal premise that §965(b)(4)(A) resulted in an inclusion of Offset Earnings in income under §§951(a) and 960(a)(1). Because the text of §965(b)(4)(A) was expressly limited to "applying section 959," and because Treasury conceded that Offset Earnings were not actually included in income, the Final Rule rests on an erroneous

3

legal premise and is contrary to statute. Third, Treasury disregarded comments from regulated parties describing the flawed legal premises of Prop. Reg. §1.965-5(c)(1)(ii) (the "Proposed Rule") (which was substantively identical to the Final Rule). Treasury's silence in response to these significant comments was arbitrary and capricious. For these reasons, the Final Rule must be set aside. 5 U.S.C. §706(2).

## ANALYSIS

I.   **The Statutory Framework.**

A.  **Foreign Tax Credits – In General.**

Since 1918, the Code has allowed U.S. corporations a credit for income taxes paid to a foreign country. Revenue Act of 1918, secs. 222(a), 238(a), 40 Stat. 1073, 1080; *Burnet v. Chicago Portrait Co.*, 285 U.S. 1 (1932). Under §901, a U.S. corporation may claim a direct credit for foreign taxes that it paid to a foreign country. Section 902[5] also provided an indirect credit to a U.S. corporation for foreign taxes that one of its foreign subsidiaries paid. For §902 to apply, the U.S. corporation must receive an amount constituting a dividend from that foreign subsidiary. Under §902(a), the domestic corporation was itself "deemed" to have paid the foreign subsidiary's foreign taxes with respect to that dividend. Section 904 generally limited this credit to the amount of U.S. taxes attributable to the taxpayer's foreign-source taxable income.

B.  **Subpart F and Foreign Tax Credits.**

Prior to the TCJA, foreign subsidiaries of U.S. corporations (called "controlled foreign corporations" under the Code) earned different types of income. Some income was "deferred" and

---

[5] Section 902 was repealed by TCJA sec. 14301(a), effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end. Based on that effective date, §902 applied to the foreign corporations discussed herein and to FedEx's FY18 tax year.

not subject to immediate tax in the U.S. Other income was immediately taxed in the U.S. under subpart F of the Code (§§951-965), a detailed set of rules that identified particular types of foreign income as being included in a U.S. shareholder's income and subject to tax under §951(a). Regardless of what the U.S. did, foreign countries also taxed this foreign-earned income. Section 960 coordinated with §902 to provide a credit against U.S. taxes for the foreign taxes paid on both kinds of foreign income (immediately taxed and "deferred"). Specifically, if §951(a) caused foreign earnings to be actually included in U.S. income (and thus subject to immediate tax), §960(a)(1) treated those foreign taxes as if the U.S. shareholder had paid them, and §902 provided a credit against U.S. tax for the foreign taxes paid on the earnings actually included in income. Similarly, if "deferred" earnings were eventually distributed (e.g., by a dividend) to the U.S. shareholder, then §960(a)(3) treated those earnings as a dividend for purposes of §902, which in turn provided an indirect foreign tax credit for foreign taxes paid on those earnings. By its terms, §960(a)(3) applied to "[a]ny portion of a distribution from a foreign corporation received by a domestic corporation which is excluded from gross income under section 959(a)." So §960(a)(3) applied regardless of whether there was an actual income inclusion under §951. As long as the income was classified as previously taxed income under §959, then §960(a)(3) was triggered when that income was brought back to the U.S. Collectively, these intricate statutes (§§901, 902, 904, and 960) unambiguously addressed when foreign tax credits were available.

### C. The Transition Tax.

The TCJA changed how the U.S. taxed corporations, transitioning from a "worldwide" system (taxing a U.S. corporation on income earned around the world) to a "territorial" system in which (with many exceptions) "only" U.S. income is subject to U.S. tax. To facilitate this sea change in the tax law, Congress imposed a one-time "transition tax" on "deferred" foreign

earnings. Specifically, §965(a) treated certain deferred foreign earnings as included in income (and thus taxable) under §951(a). To determine the earnings to be included in income (and thus subject to this transition tax), §965(b) netted the earnings of the historically profitable controlled foreign corporations with the losses of the historically loss-making controlled foreign corporations.[6] The net amount (the "§965(a) inclusion") was included in income and subject to tax at a reduced rate. Congress thought about the foreign taxes that were paid on these deferred earnings and enacted §965(g) to correspondingly reduce the foreign tax credit on that inclusion.

Due to the netting process described above, some of the positive foreign earnings were offset by losses, a valuable tax attribute. Section 965(b)(4)(A) treated these "Offset Earnings" as previously taxed income, but it did not actually include them in income. Rather, those earnings were offset with losses before the net amount was included in income. Congress managed all this by carefully limiting the scope of §965(b)(4)(A) so that it applied solely "[f]or purposes of applying section 959." Congress did not say that "Offset Earnings" were treated as having been included in income "for purposes of applying the Code" or even "for purposes of applying subpart F." Because Offset Earnings are only treated as having been included in income "[f]or purposes of applying section 959," Offset Earnings are explicitly not treated as having been included in income "for purposes of applying §951(a)." After §965(b)(4)(A) classified Offset Earnings as previously taxed income under §959, the foundational foreign-tax-credit provisions of the Code continued to apply to determine eligibility for a credit for foreign taxes paid on Offset Earnings.

---

[6] Under §965, the controlled foreign corporations with positive earnings are called "deferred foreign income corporations" or "DFICs," and the loss-making controlled foreign corporations are called "earnings and profits deficit foreign corporations" or "EDFCs."

II.     **The Code Unambiguously Foreclosed The Agencies' Attempt to Disallow Credits for Foreign Taxes Actually Paid and Properly Claimed.**

It is axiomatic that a regulation cannot amend a statute, *Koshland v. Helvering*, 298 U.S. 441, 447 (1936), or add to the statute "something which is not there." *United States v. Calamaro*, 354 U.S. 351, 359 (1957). The Final Rule must be read in this context. After all, only Congress can change legislative text. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986) ("As we so often admonish, only Congress can rewrite [a] statute."). A regulation that exceeds statutory authority or that is contrary to statute is invalid and must be set aside. 5 U.S.C. §706(2)(C); *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). The Code provided credits for foreign taxes paid on Offset Earnings. Here, Treasury attempted to "enlarge the scope of the statute" to disallow those credits. *Busey v. Deshler Hotel Co.*, 130 F.2d 187, 190 (6th Cir. 1942). The text and structure of the Code determine when credits for foreign taxes paid on Offset Earnings are disallowed, and the Agencies cannot add a novel disallowance provision by regulation.

A.  **The Code's Foreign-Tax-Credit Framework Allowed Credits on Offset Earnings.**

The "highly reticulated Internal Revenue Code … uses language, lots of language, with nearly mathematic precision." *Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779, 789 (6th Cir. 2017). This is especially true of the intricate foreign-tax-credit framework—"a byzantine structure of staggering complexity." Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, ¶15.21[2] (Overview of the Foreign Tax Credit). Unless some specific statute disallowed foreign tax credits, the default rule was that those credits—which were given for foreign taxes paid on foreign earnings—were allowed according to the normal operation of §§902, 904, and 960. As shown above, this included credits for foreign taxes paid on Offset Earnings.

A simple example illustrates the operation of the statutes. Assume that a U.S. shareholder owns two controlled foreign corporations (which are sometimes called "CFCs"). CFC 1 has $1,000

of earnings and profits, on which it paid $250 in foreign taxes. CFC 2 has negative earnings and profits (a deficit) of $500 and never paid any foreign taxes. To calculate the §965 transition tax, under §965(b)(1) CFC 1's positive earnings (of $1,000) are reduced by CFC 2's negative earnings (of $500) such that the U.S. shareholder's transition tax is based on the remaining $500 of CFC 1's positive earnings. Under §965(a), the excess amount of the positive earnings (i.e., $500) are actually included in income under §951(a)(1)—i.e., they're treated as "subpart F income" and immediately taxed. When the §965(a) amount is taxed (by being included in income under §951(a)), §960(a)(1) provides a credit for foreign taxes paid. Since half of CFC 1's earnings were included in income under §§965(a) and 951(a), a proportionate amount of the foreign taxes paid on those earnings was creditable (under §§901 and 902). Thus, $125 of foreign taxes (50% of $250) were creditable at the time of the inclusion in income of the §965(a) amount (subject to any disallowance of credits under §965(g)).

The remaining $500 of CFC 1's positive earnings are Offset Earnings. Under §965(b), this $500 of Offset Earnings is not included in income under §951(a), but §965(b)(4)(A) treats the Offset Earnings as previously taxed income (by invoking §959, which classifies earnings as previously taxed income). CFC 1 paid foreign taxes on these Offset Earnings, so when these earnings are distributed to the U.S. shareholder, §960 provides a credit to the U.S. shareholder for foreign taxes paid on those Offset Earnings. Because the Offset Earnings were not actually included in income—under §965(a), §951(a), or any other provision—§960(a)(1) does not apply. But §960(a)(3), which provides a credit for any foreign taxes paid that were not creditable under §960(a)(1), does apply. It mandates that "[a]ny portion of a distribution … which is excluded from gross income under section 959 shall be treated … as a dividend, solely for purposes of taking into account under section 902 any income … taxes paid to any foreign country … which were not

deemed paid … under [§960(a)(1)]." Accordingly, when the $500 of Offset Earnings are distributed to the U.S. shareholder, §960(a)(3) provides a credit for the remaining $125 of foreign taxes paid on those earnings.

Collectively, the plain text of these detailed statutory provisions shows that Congress unambiguously foreclosed any regulatory attempt to disallow foreign tax credits on Offset Earnings beyond the disallowance provisions expressly set forth in the Code. Nothing in the TCJA changed that result. More pointedly, the Code's comprehensive foreign-tax-credit provisions left no gaps to fill when it came to determining the creditability of foreign taxes paid on Offset Earnings. Congress can change the Code; Treasury cannot. The Final Rule cannot override this statutory scheme and disallow credits that the Code otherwise authorized. *See*, *e.g.*, *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325-26 (2014) (agency cannot "tailor legislation to bureaucratic policy goals by rewriting unambiguous statutory terms"); *Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001) (invalidating consolidated return regulations under §1502 that purported to deny economic losses permitted under §165).

### B. The TCJA Expressly Disallowed Certain Foreign Tax Credits, But Not Credits on Offset Earnings.

The drafters of the TCJA didn't just forget about foreign tax credits. Rather, the TCJA directly addressed the disallowance of foreign tax credits and carefully considered how to incorporate the century-old foreign-tax-credit framework with the new concepts unveiled in the TCJA. Before the TCJA, corporate earnings typically were taxed at a 35% rate. 26 U.S.C. §11. The transition tax's lower 15.5% rate came with a price—§965(g)'s disallowance of certain foreign tax credits. To reach that 15.5% rate, §965(c) provided a deduction that reduced the tax rate on

earnings taxed under §965.[7] Section 965(g) correspondingly disallowed a percentage of foreign taxes paid for any amount for which a deduction was allowed under §965(c)—in essence, foreign taxes paid on earnings that were included in income under §§965(a) and 951(a). Section 965(g) meticulously describes the disallowance of specific foreign tax credits, provides mathematical formulas to derive the disallowed amounts, and coordinates the disallowance with other foreign-tax-credit provisions. That disallowance was significant—in FedEx's case, §965(g) disallowed more than $115 million in foreign tax credits. Pourciaux Decl. ¶16, Ex. 2. But §965(g) did not disallow any amount of foreign taxes paid on Offset Earnings. That's because Offset Earnings were not actually included in income under §951(a).

In the context of the transition tax, §965(g) shows that Congress unambiguously addressed the full scope of the disallowance of foreign tax credits. By detailing that disallowance with mathematical precision, Congress demonstrated it was aware of, and had fully accounted for, the interaction between the transition-tax regime and the foreign-tax-credit regime. Congress otherwise left intact the statutory provisions that allowed (and disallowed) foreign tax credits on pre-2018 previously taxed income. Apart from the §965(g) disallowance, "[o]ther foreign tax credits used by a taxpayer against tax liability resulting from the deemed inclusion apply in full." H.R. Rep. No. 115-409, at 380 n.952 (2017), Ex. 16. Because "Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, the court's inquiry is complete. *Clark Reg'l Med. Ctr. v. HHS*, 314 F.3d 241, 245 (6th Cir. 2002).

Congress doesn't cloak the disallowance of foreign tax credits in obscure language. When

---

[7] The §965(c) deduction aims to tax cash or cash equivalents at a 15.5% rate and other property at an 8% rate. H.R. Rep. No. 115-466, at 620 (2017). (All of FedEx's deferred foreign earnings were taxed at the 15.5% rate.) For an overview of the deduction's computational steps, *see* Carol P. Tello & Hyowon Lee, The Importance of Understanding the Section 965 Calculations, 91 Tax Notes Int'l 1311 (Sept. 24, 2018), Ex. 11.

Congress means to disallow credits, it does so expressly—as it did at least six times in the TCJA.[8] In addition to §965(g), at least five other TCJA provisions directly addressed the extent of foreign-tax-credit disallowance; none of these statutes disallowed credits on Offset Earnings. First, for post-2017 foreign-tax payments, Congress repealed the §902 "indirect" foreign tax credit and replaced it with a new dividends-received deduction under §245A. TCJA §14301(a), 131 Stat. 2221, Ex. 13. Second, new §245A(d) disallows credits for foreign taxes paid on amounts for which a §245A dividends-received deduction is allowed—i.e., for dividend distributions of earnings and profits after December 31, 2017 (but not for pre-2018 Offset Earnings). For FedEx, that disallowance is more than $198 million in foreign taxes paid as of May 31, 2018. Pourciaux Decl. ¶18, Ex. 2. Third, in calculating the overall foreign-tax-credit limitation, new §904(b)(4) excludes deductions allocable to tax-exempt dividends under §245A, which reduces a taxpayer's overall foreign tax credits. Fourth, Congress added §960(d), which disallows 20% of foreign taxes paid or accrued on so-called "global intangible low-taxed income" ("GILTI"). Fifth, new §904(c) precludes taxpayers from carrying forward or back foreign tax credits attributable to GILTI, forcing taxpayers to use those credits in the current tax year or lose them altogether.[9]

---

[8] Congress also has explicitly disallowed foreign tax credits in many other Code provisions. *See, e.g.*, 26 U.S.C. §§901(i)-(m) (denying foreign tax credits related to specific types of transactions); Kuntz, Peroni & Bogdanski, U.S. International Taxation ¶B4.06, Special Limits and Exclusions for Taxes That May be Credited (describing the Code's "numerous limits on the taxes that may result in U.S. foreign tax credits," including "some Code sections [that] exclud[e] certain foreign taxes entirely"). More importantly, the Code expressly disallowed certain credits under §960. 26 U.S.C. §901(j) (disallowing certain credits for "taxes paid or accrued (or deemed paid under section 960)"); §901(m) (certain foreign tax payments "shall not be taken into account for purposes of section 960"). These Code sections—none of which disallow credits on Offset Earnings—show that Congress is clear when it chooses to disallow credits that the Code otherwise grants.

[9] *See Ingersoll-Rand Co. & Subs. v. United States*, No. 3:16-cv-289 (W.D. N.C.), Hr'g Tr. at 92, Ex. 12 ("What the Court finds most compelling, however, is the fact that Congress clearly knew how to deny foreign tax credit because it expressly did so in the very same legislation with regard to exempt trade income of foreign sales corporations."). See section III.B. below.

In short, Congress knew how to deny or limit foreign tax credits, as it did in §965(g) and several other TCJA provisions. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardner*, 513 U.S. 115, 120 (1994) (applying *Russello v. United States*, 464 U.S. 16, 23 (1983), to invalidate an agency regulation). The "'[n]egative implications raised by disparate provisions are strongest' in those instances in which the relevant statutory provisions were 'considered simultaneously when the language raising the implication was inserted.'" *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008) (cleaned up). Although Congress expressly disallowed certain foreign tax credits in §965(g), Congress did not disallow credits on Offset Earnings there or elsewhere in the TCJA. Once again, §965 left no gap to fill, and apart from the express credit disallowance in §965(g), the baseline foreign-tax-credit provisions of the Code applied to allow FedEx foreign tax credits on Offset Earnings.

### C.  The Code's Rulemaking Grants Don't Provide Authority for the Final Rule.

The rulemaking provisions on which the Agencies rely—§§902(c)(8), 965(o), and 7805(a)—do not authorize them to promulgate regulations to override multiple Code provisions—§§901, 902, 904, and 960—that specifically govern when and how foreign tax credits are allowed and disallowed. "Merely because an agency has rulemaking authority does not mean that it has delegated authority to adopt a particular regulation." *NYSE v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020). "[G]eneral rulemaking authority … established to *enforce* and *carry out* a congressional act" does not "empower[] an agency … to promulgate regulations which run far afield from the specific substantive provisions of the act." *Cent. Forwarding, Inc. v. Interstate Com. Comm'n*, 698 F.2d 1266, 1277 (5th Cir. 1983) (emphasis added). Simply put, the Agencies' "authority … to

prescribe rules and regulations to administer a statute … does not include the power to make law." *Reid v. Memphis Publ'g Co.*, 521 F.2d 512, 520 (6th Cir. 1975). In addition, denying a credit amounts to imposing a tax, and the Agencies lack that power. *See Commissioner v. Acker*, 361 U.S. 87, 92 (1959) ("to uphold this addition to the tax would be to hold that it may be imposed by regulation, which, of course, the law does not permit").

The basic rulemaking authority in §7805(a) limits the Agencies to "enforcing" the Code, not overriding it. It presupposes a statute that already exists and is capable of being enforced. *See* Webster's II New College Dictionary 380 (3d ed. 2005) ("enforce" means "to compel observance of" or obedience to a law). Section 7805(a) has never allowed the Agencies to issue a regulation that is contrary to statute.[10] Nearly 90 years ago, the Supreme Court clarified that the Agencies' power to prescribe regulations "is not the power to make law … but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134 (1936); *see also Nat'l Wildlife Fed'n v. Dep't of Transp.*, 960 F.3d 872, 877 (6th Cir. 2020) (same). In invalidating an earlier Treasury regulation, the Supreme Court elaborated on that point, holding that "where … the provisions of the act are unambiguous, and its directions specific, there is no power to amend it by regulation." *Koshland*, 298 U.S. at 447. Section 7805(a) does not authorize the Agencies to create a novel foreign-tax-credit disallowance rule that has no statutory basis. *See Calamaro*, 354 U.S. at 359 (a Treasury regulation cannot "add[] to the statute … something which is not there"). There is no statute that

---

[10] Some version of §7805(a) has been in the Code for more than 150 years. *See* Revenue Act of 1862, Pub. L. No. 37-119, ch. 119, 12 Stat. 432 (July 1, 1862). The statutory text has remained much the same since 1917. *See, e.g.*, War Revenue Act of 1917, Pub. L. No. 65-50, ch. 63, §1005, 40 Stat. 300, 326 (Oct. 3, 1917).

disallows credits on Offset Earnings, so there is nothing for the Agencies to enforce.

Sections 902(c)(8) and 965(o) similarly limit Treasury's rulemaking authority to "carry[ing] out the provisions" of the statutes to which they relate. To "carry out" means "[t]o put into practice or effect," "[t]o obey," or "[t]o bring to a conclusion." Webster's II New College Dictionary 175 (3d ed. 2005). By directing Treasury to promulgate regulations to "carry out" "the provisions" of §§960 and 965, Congress again tethered Treasury's rulemaking authority to the text of those provisions themselves. These rulemaking grants are not "an invitation to ignore" statutory language. *Michigan v. EPA*, 576 U.S. 743, 753 (2015). While §965(o) contemplates regulations that "prevent the avoidance of the purposes of this section," the purpose of §965 is to transition the U.S. tax system from a worldwide to a territorial system, not to disallow foreign tax credits that the Code otherwise allows. And there is nothing abusive in FedEx's distributions. Indeed, bringing cash back to the U.S. for use in the U.S. was one of the TCJA's primary purposes.[11] More pointedly, even if a statute authorizes the agency to act to achieve the "purposes" of the statute, a regulation cannot override the statute itself. Just last month the Supreme Court invalidated an agency regulation promulgated under a statute that authorized the agency to act "as necessary for purposes of" the statute. *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1900 (2022). Notwithstanding that statutory grant, the regulation was invalid because it was contrary to the "text and structure" of the statute. *Id.* at 1904. Because nothing in §965 authorizes the Agencies to

---

[11] *See* H.R. Rep. No. 115-409, at 375 (2017), Ex. 16 ("the Committee seeks … to encourage investment in the United States"); President's Remarks at Signing of TCJA (Dec. 22, 2017), Ex. 15 ("We're going to bring back … a tremendous amount of money that was caught overseas that the bureaucracy plus the tax laws didn't allow [] to reasonably be brought back into our country."). Far from being abusive, a cash distribution made to pay U.S.-based expenses is fundamental to a company's global cash management and was specifically encouraged by the TCJA. The Agencies may dislike the ability of U.S. taxpayers to offset their U.S. tax obligations based on taxes actually paid overseas, but nothing undermines the ironclad business purpose of repatriating cash to pay ordinary and necessary business expenses.

disallow foreign tax credits on Offset Earnings, the Agencies have "promulgate[d] regulations which run far afield from the specific substantive provisions of the [statute]." *Cent. Forwarding*, 698 F.2d at 1277. In short, no statute authorizes a blanket disallowance of credits on Offset Earnings, so the Agencies have nothing to "carry out."

**III.    The Final Rule Is Contrary to Statute.**

The validity of the Final Rule turns on a straightforward point of statutory construction. The Agencies contend that §965(b)(4)(A) treated Offset Earnings as being included in income under §951(a)(1). To reach this erroneous conclusion, the Agencies ignored the scope limitation in the first part of §965(b)(4)(A) and attempted to expand the statute by treating §965(b)(4)(A) as if it were not limited to applying §959 and as if it triggered an income inclusion under §951(a). However, §965(b)(4)(A) is unambiguous. It simply establishes that Offset Earnings are treated as previously taxed income under §959. Nothing in the statute's plain text provides for an actual income inclusion under §951. Without the premise of an actual income inclusion to undergird it, the Agencies' argument collapses.[12]

**A. The Final Rule Suffers From Five Fundamental Errors.**

**1.    First, the Agencies Ignore the Limiting Opening Phrase of §965(b)(4)(A).**

Section 965(b)(4)(A) describes how Offset Earnings are treated.

Reduced earnings and profits treated as previously taxed income when distributed. For purposes of applying section 959 in any taxable year beginning with the taxable year described in subsection (a), with respect to any United States shareholder of a deferred foreign income corporation, an amount equal to such shareholder's reduction under paragraph (1) which is allocated to such deferred foreign income

---

[12] Because the Code unambiguously forecloses the Final Rule, that regulation is invalid under *Chevron* step one. Even if the Code were ambiguous—and it is not—the result would be the same under *Chevron*'s second step, which forbids regulations that are "arbitrary or capricious in substance, or manifestly contrary to the statute." *Good Fortune Shipping SA v. Commissioner*, 897 F.3d 256, 261 (D.C. Cir. 2018). *See also* 5 U.S.C. §706(2)(A) (court "must set aside" agency regulations that are "arbitrary, capricious, or otherwise contrary to law").

corporation under this subsection shall be treated as an amount which was included in the gross income of such United States shareholder under section 951(a).

Parsing the provision, the opening phrase of the statute limits its scope—it applies only "[f]or purposes of applying section 959" in the year of the transition tax determination and thereafter. *See Stanovsek v. Holder*, 768 F.3d 515, 520 (6th Cir. 2014) ("for purposes of" is "limiting initial language"); *Hughes v. McCarthy*, 734 F.3d 473, 485 (6th Cir. 2013) (same); *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 37-38 (D.D.C. 2008) ("for purposes of" is classic limiting language). The statute then identifies the taxpayer at issue—the U.S. shareholder of a deferred foreign income corporation (i.e., a foreign corporation with earnings that the U.S. had not previously taxed). Next, the statute describes the amount at issue—Offset Earnings. Finally, the statute describes the tax treatment of those Offset Earnings—i.e., as having been previously included in income under §951(a) (the statute that imposes a tax on subpart F income), but only for purposes of applying §959. With respect to the FY18 Distributions, this means that the Offset Earnings were not actually included in income under §951(a)—they were earnings of a deferred foreign income corporation that had not been taxed in the U.S.—and they constituted previously taxed income (based on the application of §959).

Section 965(b)(4)(A)'s title—"Reduced earnings and profits treated as previously taxed income when distributed"—"makes clear the narrowness of its scope." *Biden v. Texas*, 2022 U.S. LEXIS 3269, at *9 (June 30, 2022). Any reference to a disallowance of credits is conspicuously absent from the title and the text of §965(b)(4)(A). If Congress had wanted to disallow foreign tax credits, it could have said so, as it did in §965(g), "Disallowance of foreign tax credit, etc."

Despite clear statutory text, the Agencies ignored the scope limitation in §965(b)(4)(A) and posited that Offset Earnings were deemed to be included in income under §951(a) (even though acknowledging they weren't) and thus "should similarly be treated as having resulted in foreign

16

taxes deemed paid under section 960(a)(1)" (even though they didn't allow a foreign tax credit under that provision either). 84 Fed. Reg. at 1857. The statute says no such thing. Nothing in §965(b)(4)(A) creates an actual income inclusion under §951(a). Instead, §965(b)(4)(A) places Offset Earnings in §959, making them previously taxed income. Section 959 stands on its own. Applying §959 does not require a §951(a) income inclusion, and nothing in §959 requires the additional leap of crediting foreign taxes paid under §960(a)(1) as if they were included in §951(a). While §959 would also apply after there has been an income inclusion under §951(a), §965(b)(4)(A) doesn't push the Offset Earnings into §951. It simply provides that Offset Earnings constitute previously taxed income under §959; not that Offset Earnings are actually included in income under §951(a). By invoking §959 (and explicitly not §951(a)), Congress drew a direct line from §965(b)(4)(A) to §960(a)(3) (which expressly references §959), thereby providing a credit for foreign taxes paid on Offset Earnings.

In the preamble, the Agencies paid lip service to the limiting language, but nonetheless read those words—"[f]or purposes of applying section 959"—out of the statute. *See Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that [the statute] was considered … is not a substitute for considering it."). In ignoring that limitation, the Agencies fail to "give effect, if possible, to every clause and word of a statute" and thus violate a "cardinal principle of statutory construction." *Williams v. Taylor*, 529 U.S. 362, 404 (2000).

## 2.  Second, the Agencies Disregard the Netting Rules in §965(b).

Section 965(a) increases the subpart F income of profitable foreign subsidiaries by the subsidiaries' "accumulated post-1986 deferred foreign income"—the foreign income that wasn't previously taxed in the U.S. This is the first step in determining the amount of additional subpart F income to be taxed under §965. Section 965(b) then reduces the amount of the §965(a) income

inclusion by the "aggregate foreign [earnings and profits] deficit"—i.e., the losses of loss-making foreign subsidiaries. Together, §§965(a) and (b) describe the statute's "netting" approach—i.e., the process of reducing the earnings of profitable foreign subsidiaries by the losses of loss-making foreign subsidiaries.

The preamble to the Final Rule ignores this netting process and states that Offset Earnings are "treated as included in income under section 951(a)" by virtue of §965(a).[13] 84 Fed. Reg. at 1857. However, the plain text of §965(b)(1) refers to "the amount which would (but for this subsection) be taken into account under section 951(a)(1)." Because of §965(b), Offset Earnings are explicitly not included in taxable income under §951(a). Also, by clarifying that the "aggregate foreign E&P deficit" reduces the amount of income included under §965(a) (and thus under §951(a)(1)), §965(b) shows that the Offset Earnings were not "treated as included in income under section 951(a)." Yet again, the Agencies misread the statute to subvert clear statutory text in search of their own policy preferences.

### 3. Third, §965 Does Not Treat Foreign Taxes Paid on Offset Earnings as Having Been Deemed Paid Under §960(a)(1).

The Agencies contend that foreign taxes on Offset Earnings "were treated as deemed paid under section 960(a)(1) when those earnings were treated as included in income under section 951(a)." 84 Fed. Reg. at 1857. Based on this erroneous premise, the Agencies concluded that

---

[13] Specifically, the preamble states:

> Because foreign income taxes attributable to a section 965(a) earnings amount that were offset by an aggregate foreign E&P deficit were treated as deemed paid under section 960(a)(1) when those earnings were *treated as included in income under section 951(a)*, those taxes are not available to be deemed paid again under section 960(a)(3) upon a subsequent distribution of the section 965(b) previously taxed earnings and profits.

84 Fed. Reg. at 1857 (emphasis added).

"those taxes are not available to be deemed paid again under section 960(a)(3) upon a subsequent distribution of the section 965(b) previously taxed earnings and profits." *Id*.

When Congress intends to "treat [foreign taxes] as deemed paid," it says so explicitly. For instance, §902 specifically stated that a U.S. shareholder "shall be deemed to have paid" the foreign taxes that its controlled foreign corporation paid under certain circumstances. Section 965(b)(4)(A) contains no similar language.[14] Neither did §960(a)(1), which provided a credit only "if there is included under section 951(a) in the gross income of a domestic corporation" earnings and profits of a foreign subsidiary. This text does not refer to a "deemed" inclusion; §960(a)(1) requires an actual income inclusion under §951(a)(1). The Agencies concede that Offset Earnings have "never actually … been included in U.S. taxable income." 84 Fed. Reg. at 1857 (referring to "section 965(b) previously taxed earnings and profits," which are synonymous with Offset Earnings). This concession undermines the Agencies' entire "explanation" and shows that the Final Rule rests on a faulty legal premise. If Offset Earnings were not included in income under §951(a), then §960(a)(1), which requires an actual §951(a) income inclusion, cannot apply.

What's more, under the Agencies' "heads I win, tails you lose" approach, even though foreign taxes on Offset Earnings supposedly are "treated as deemed paid under section 960(a)(1)," the Final Rule disallows credits under §960(a)(1) as well. If Offset Earnings had been included in income under §951(a), then credits for foreign taxes paid on those earnings would have been allowed under §960(a)(1). Instead of adopting a consistent (but still incorrect) interpretation, the Agencies' concoct a scheme to disallow credits under both §§960(a)(1) and (a)(3). Even if the

---

[14] Section 965(n)(2), which pertains to a taxpayer's election not to apply a net operating loss deduction, specifically references "taxes deemed to be paid" under new §960(a) and (b). Congress knew how to invoke the concept of deemed paid taxes when it wanted to, and the absence of similar text in §965(b)(4)(A) underscores the error in the Agencies' argument.

Agencies' interpretation of §965(b)(4)(A) made sense—and it does not—their results-based approach plainly subverts the statutory text.

### 4.   Fourth, the Agencies Mistakenly Conclude That Something That Is True of a Part Must Be True of the Whole.

In the preamble to the Final Rule, the Agencies argue:

> If the section 965(b) previously taxed earnings and profits are treated as previously taxed E&P excluded from gross income on distribution under section 959(a) in applying section 960(a)(3), it *necessarily follows* that in applying that same section those amounts are *treated as having been included in income under section 951(a) and resulted in foreign taxes deemed paid under section 960(a)(1) as well*.

84 Fed. Reg. at 1857 (emphasis added). This flawed contention goes to the heart of the Agencies' mistake. Treating taxes paid on Offset Earnings as being "deemed paid" under §960(a)(1) does not "necessarily follow[]" from the statute. By its terms, §965(b)(4)(A) treats Offset Earnings as included in income under §951 solely "for purposes of applying section 959"—i.e., as previously taxed income. Once that treatment is triggered, a separate statute—§960—determines whether foreign taxes paid on that income are creditable. But §960(a)(1) requires an actual inclusion in income under §951(a). And as the Agencies concede, Offset Earnings were "never actually included in income." 84 Fed. Reg. at 1857. So §960(a)(1) cannot apply.

By limiting §965(b)(4)(A) to apply only "[f]or purposes of applying section 959," Congress made clear that it did not actually include Offset Earnings in income under §951(a) or treat taxes paid on those earnings as creditable under §960(a)(1). A statutory reference to a particular section of the Code (i.e., §959) emphatically does not include the whole (i.e., the rest of the Code), "[n]ot because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). Through §965(b)(4)(A), Congress simply classified Offset Earnings as previously taxed income (the basic function of §959) and thereby left

intact the baseline foreign-tax-credit provisions of the Code, the plain terms of which provided a credit for foreign taxes paid on Offset Earnings.

To be sure, Congress could have applied §965(b)(4)(A) more broadly, as it did with the very next subsection—§965(b)(4)(B), which applies "for purposes of this title."[15] If Congress had wanted to create an actual income inclusion under §951(a) and to make taxes paid on Offset Earnings creditable under §960(a)(1), it would have replaced the words "section 959" in §965(b)(4)(A) with "this title," or with "subpart F," or even with "section 960," and that basic statutory text "would have done the trick." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017). "The fact that [Congress] did not adopt this readily available and apparent alternative strongly supports" the conclusion that §965(b)(4)(A) is limited to §959. *Knight v. Commissioner*, 552 U.S. 181, 188 (2008). Treasury cannot use a regulation to change the scope of the statute or ignore its limiting language. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.").

### 5. Fifth, the Agencies Erroneously Contend That §960(a)(3) Applied Only to Withholding Taxes.

The preamble to the Final Rule stated that "the credit allowed under section 960(a)(3) is only with respect to foreign income taxes imposed on an upper-tier foreign corporation on distributions of … section 965(b) previously taxed earnings and profits from a lower-tier foreign corporation." 84 Fed. Reg. at 1858. Said differently, the Agencies contend that §960(a)(3) is solely limited to withholding taxes. That's wrong on the face of the provision. By its terms, §960(a)(3)

---

[15] Section 965 uses the phrase "for purposes of" 31 separate times to repeatedly limit the scope of particular rules. One of those provisions—§965(e)(2)—expressly limits the rule "[f]or purposes of section 951 and 961." Congress knew how to explicitly invoke §951, as it did in later in §965.

broadly applied to "any" taxes—it doesn't say withholding taxes—paid "on or with respect to the accumulated profits" that were "excluded from gross income under section 959(a)" as long as such taxes were not previously deemed paid by the U.S. shareholder. By using the term "any," §960(a)(3) applied to *all* taxes covered by its text, not some limited subset of taxes. *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("any" means "one or some indiscriminately of whatever kind"). Section 960(a)(3)'s reference to taxes paid "on or with respect to" the distributed profits highlights the statute's breadth. The phrase "with respect to" is expansive and synonymous with "related to," "in connection with," and other similar terms. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 856 (2018) (Thomas, J., concurring); *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (Sotomayor, J.) (equating "with respect to" to "related to" and observing that these terms apply broadly). Likewise, §960(a)(3)'s reference to the "accumulated profits" of the distributing foreign corporation includes earnings and profits that the foreign corporation generated through its own operations as well as any earnings and profits that its subsidiaries distributed to it. Treas. Reg. §1.964-1(a)(1); §61(a)(7). In short, §960(a)(3) applied to all of the foreign taxes paid on Offset Earnings, not just withholding taxes.

The Agencies' novel attempt to use the Final Rule to narrow the scope of §960(a)(3) and disallow credits that the Code expressly authorizes is particularly remarkable in light of the fact that the Agencies never, in the 55-year history of §960(a)(3), issued a regulation to that effect. "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regulatory Grp.*, 572 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). The Final Rule's attempt to rewrite §960(a)(3) is "bad wine of recent vintage." *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia,

J., concurring). It is also contrary to statute and invalid.

**B.   Another Federal District Court Rejected the Exact Same Arguments the Agencies Made Regarding the Final Rule.**

Just three years ago, the government peddled these same flawed statutory arguments, and another federal court rejected them in favor of the plain statutory text. In *Ingersoll-Rand Co. & Subs. v. United States*, No. 3:16-cv-289 (W.D.N.C.), the taxpayer claimed that it was entitled to credits for foreign taxes paid on certain "export trade income." As in FedEx's case, Congress in that case explicitly treated the export trade income as "previously taxed income." Pub. L. No. 98-369, sec. 805(b)(2), (c), 98 Stat. 494 (1984). And Treasury regulations stated that the export trade income was treated as "previously taxed income previously included in the income of a U.S. shareholder *for purposes of section 959*." Treas. Reg. §1.921-1T(c)(1) (emphasis added). Ingersoll-Rand's foreign subsidiaries distributed the export trade income to the U.S., and Ingersoll-Rand claimed a credit for foreign taxes paid on the income. The taxpayer explained that because the export trade income was treated as previously taxed income under §959 and there had not been any actual income inclusion under §951(a), §960(a)(1) did not apply, and therefore §960(a)(3) provided a credit for foreign taxes paid on that income when the export trade income was distributed to the U.S.

The government argued that because the export trade income was treated as previously taxed income under §959, there must have been an income inclusion under §951(a). Echoing the "necessarily follows" argument in the preamble to the Final Rule (84 Fed. Reg. at 1857), the government in *Ingersoll-Rand* argued: "When Congress treated undistributed export trade income as previously taxed income [for purposes of §959], by the same stroke, the income was treated as already included in the U.S. shareholder's income under §951(a)." Mem. in Supp. of U.S. Cross-Mot. for Summ. J., Dkt. No. 34. Just as with the Agencies' explanation of the Final Rule, in

23

*Ingersoll-Rand* the government imagined an income inclusion that did not actually occur. *Id.*

After full briefing and oral argument on a motion for summary judgment, the Court ruled from the bench that the government's arguments were "without merit" and its position was not supported by any "statutory, regulatory, or judicial authority." Hr'g. Tr. at 92, Ex. 12.[16] The only difference between the Agencies' explanation of the Final Rule and the government's statutory arguments in *Ingersoll-Rand* is that here, the Agencies issued a regulation based on their flawed statutory analysis. Just as in *Ingersoll-Rand*, the government's arguments are contrary to statute and must be rejected. The Agencies cannot rewrite unambiguous statutory text and salvage their flawed statutory arguments by repackaging them in a regulation. *Util. Air Regulatory Grp.*, 573 U.S. at 328 (it is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate").

### C. Ultimately, the Final Rule Is Nothing More Than the Agencies' Attempt to Substitute Their Policy Preference for Congress's.

The Agencies' contention that foreign taxes paid on Offset Earnings "should … be treated" as resulting in a deemed-paid credit under §960(a)(1) (which they do not give) reveals the Agencies' real complaint—Congress made a policy choice *not* to apply §965(b)(4)(A) more broadly to require an income inclusion under §951(a) or to provide credits under §960(a)(1). Only Congress can make that call. The Agencies cannot "rewrite the statute simply because [they] may feel that the [statutory] scheme … could be improved upon." *Calamaro*, 354 U.S. at 357.

The Agencies' policy preference rests on the mistaken assumption that allowing credits on Offset Earnings results in a "windfall double benefit." 84 Fed. Reg. at 1857. The Agencies think

---

[16] The Court subsequently issued an order incorporating the reasons stated in the bench ruling and directed the parties to jointly prepare a proposed judgment. Dkt. No. 41. The parties later agreed to voluntarily dismiss the lawsuit. Dkt. No. 53.

that because §965(b)(4)(A) treated Offset Earnings as previously taxed income, that income was fully exempt from tax in the U.S. Wrong again. A distribution of Offset Earnings reduces a U.S. shareholder's basis under §961(b), thereby creating increased gain (or decreased loss) on a subsequent sale or on a distribution in excess of reduced basis. Complaint at ¶67. Thus, the credits are necessary to avoid double taxation.[17] FedEx has already paid additional tax because of the absence of a basis adjustment under §961. Pourciaux Decl. ¶31, Ex. 2.

When confronted with a real double benefit, Congress expressly disallows foreign tax credits. *See, e.g.*, §911(d)(6) (denying foreign tax credits for certain foreign-earned income that is exempt from U.S. taxation). If Congress saw a problem, it would have fixed it. Instead, it left the foreign-tax-credit structure in place for foreign taxes paid on Offset Earnings. Even if there were a double benefit (and there is not), "[b]ecause the Code's plain text permits the taxpayers here to receive these benefits, [this Court] need not address this [windfall double-benefit] policy concern." *Gitlitz v. Commissioner*, 531 U.S. 206, 219-20 (2001).[18] The Agencies cannot ignore a clear Congressional mandate merely because they would have written the statute differently. "Disagreeing with Congress's expressly codified policy choices isn't a luxury administrative agencies enjoy." *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016).

In December 2018, more than four months after the Agencies issued the Proposed Rule, the staff of the Joint Committee on Taxation acknowledged that a regulation was insufficient to

---

[17] Treas. Reg. §1.965-2(f), which provides for an elective basis adjustment, does not resolve this problem. To apply that regulation, a taxpayer must join in the Agencies' misinterpretation of clear statutory text by agreeing that §965(b)(4)(A) causes Offset Earnings to be included in income under §951. An agency cannot compel a taxpayer to ignore the statute.

[18] *See also Ingersoll-Rand*, No. 3:16-cv-289 (W.D. N.C.), Hr'g Tr. at 92, Ex. 12 ("There is no support in the case law for a requirement that income must be taxable in the U.S. in order for foreign taxes paid on such income to give rise to a foreign tax credit[.]").

accomplish the Agencies' policy goal of disallowing credits that the Code explicitly allowed.[19] And so in January 2019 (more than five months after the Agencies issued the Proposed Rule), one Congressman proposed to add new §965(g)(5)—"Denial of foreign tax credit with respect to certain amounts treated as previously taxed income." If enacted, that statute would have provided that "[n]o credit shall be allowed under section 901 for any taxes paid or accrued (or treated as paid or accrued) with respect to any amount described in subsection (b)(4)(A)." H.R., Tax Technical and Clerical Corrections Act Discussion Draft (Jan. 2, 2019), Ex. 14 (the "Corrections Bill"). Notably, the text of proposed §965(g)(5)—which Congress never enacted[20]—is substantively identical to the Final Rule. Congress recognized that §965 did not disallow foreign tax credits for Offset Earnings and that a statutory amendment—not a regulation—was the only way to give that disallowance the force of law.

## IV.    Treasury Failed to Respond to Comments That the Final Rule Was Invalid.

"*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that

---

[19] On December 20, 2018, in the "General Explanation of Public Law No. 115-97 (JCS-1-18)," (the "Blue Book"), the staff of the Joint Committee on Taxation stated: "[I]t is intended that no deduction or credit is allowed for taxes associated with earnings and profits that, by reason of section 965(b), are not included in income." *Id.* at 362. The Joint Committee on Taxation emphasized that a regulation is insufficient to accomplish this—instead, "[a] technical correction may be needed to reflect this intent." *Id.* at 362 n.1695. Notably, the Blue Book contains no analysis of the suggested "intent." Issued nearly a year after the TCJA was enacted, the Blue Book is "post-enactment legislative history," which is "not a legitimate tool of statutory interpretation." *United States v. Woods*, 571 U.S. 31, 48 (2013) (citations omitted). Its sole utility in this case is to show that Congressional staff knew that after Treasury issued the Proposed Rule, the only way to disallow credits on Offset Earnings was to amend the statute.

[20] When Congress intended to make changes to the TCJA, it did so through legislation. Congress specifically acted on other provisions in the Corrections Bill, including provisions to resolve real errors such as the so-called Retail Glitch and the Grain Glitch. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281, 359 (Mar. 27, 2020) (resolving Retail Glitch); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 1151 (Mar. 23, 2018) (resolving Grain Glitch). If Congress intended to disallow credits on Offset Earnings, it had ample opportunity to amend §965. But it did not.

is, where the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016). To satisfy a "basic procedural requirement of administrative rulemaking," "an agency must give adequate reasons for its decisions." *Id.* In addition, "an agency must consider and respond to significant comments." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Otherwise, "[t]he opportunity to comment is meaningless." *HBO, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977).

During the rulemaking process, multiple commenters told Treasury that the Proposed Rule (which was substantively identical to the Final Rule) was contrary to statute and invalid.

- The Tax Executives Institute[21] said that the Proposed Rule was "inconsistent with the explicit limitations provided under section 965(b)(4)" and that "it effectively results in an unauthorized elimination of a tax asset granted to taxpayers by Congress." TEI Letter at 23, JA223.

- The Alliance for Competitive Taxation[22] stated that the Proposed Rule was contrary to statute "because Congress expressed no intent to limit foreign tax credits beyond [the] limit provided in section 965(g)." ACT Letter at 7, JA232.

- The Information Technology Industry Council[23] wrote: "When §965(b) previously taxed income is distributed to the United States, the taxes attributable to such previously taxed income should be considered deemed paid under former §960(a)(3) and foreign tax credits should be permitted to be used." ITIC Letter at 5, JA198.

- Hanesbrands, Inc. told the Agencies that the Proposed Rule was "inconsistent with" the Code

---

[21] TEI is the leading corporate tax organization in the United States. It has nearly 7,000 members and represents over 2,800 of the largest businesses in the United States, Canada, Europe, and Asia.
[22] ACT is a coalition of leading American companies from many industries that supports a globally competitive corporate tax system that aligns the United States with other advanced economies.
[23] ITIC represents the interests of the information and communications technology industry, including member companies that are among the global leaders in innovation.

provision "that otherwise allows taxpayers to claim a credit for foreign taxes paid on earnings that were previously taxed in the U.S." Hanesbrands Letter at 7, JA176.

- Walgreens said that the Proposed Rule "conflict[s] with the plain language of section 965(b)(4)(A), which treats the CFC's E&P as PTI only for purposes of section 959." Walgreens Letter at 3, JA262.

Despite this chorus of comments, the Agencies never even attempted to address the scope limitation in §965(b)(4)(A) (i.e., the fact that it applied only "[f]or purposes of applying section 959"). This failure to account for plain statutory text undermines any claim of reasoned decisionmaking. Because the Final Rule rests squarely on the erroneous legal premise that §965(b)(4)(A) provided for an actual inclusion of income under §951, the Agencies have fundamentally "misconceived the law" and their regulation "may not stand." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *see also Perez v. Cuccinelli*, 949 F.3d 865 (4th Cir. 2020) (invalidating agency action premised on flawed statutory interpretation).

The Alliance for Competitive Taxation also highlighted the Agencies' internally inconsistent statements. The Agencies said that §965(b)(4)(A) "treats section 965(a) earnings amounts offset by an aggregate foreign E&P deficit as previously included in income under section 951." ACT Letter at 7-8, JA232-33 (quoting 84 Fed. Reg. at 1857). The Agencies separately said that "section 965(b) [PTI] are not included in gross income under section 951(a)(1)." 83 Fed. Reg. 39514, 39537 (Aug. 9, 2018).[24] Both of these statements refer to the same earnings—"965(a)

---

[24] In pertinent part, the preamble stated:

> Because section 965(b) previously taxed earnings and profits [i.e., Offset Earnings] are not included in gross income under section 951(a)(1), the Treasury Department and the IRS have determined it would not be appropriate to apply section 986(c) with respect to distributions of those E&P.

earnings offset by an aggregate foreign E&P deficit" are the same as Offset Earnings which are the same as "section 965(b) [PTI]." ACT Letter at 7-8. Offset Earnings cannot be included and not included in income under §951(a) at the same time. Yet the agencies treat Offset Earnings like Schrödinger's cat—as inhabiting two mutually exclusive possibilities at once. The tax law is not a quantum mechanics thought experiment. Instead, a core administrative law principle is that "an internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015); *see Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (agency action was arbitrary because analysis was "internally inconsistent and inadequately explained"). Rather than acting consistently with respect to the Code's international-tax provisions, the preamble shows that the Agencies cherry-picked the interpretation of §965(b)(4)(A) that best suited their own policy goals in each specific instance, and they ignored comments that pointed out their flawed approach. To the Agencies, Offset Earnings are "treated as deemed included" in income when it means that taxpayers lose credits under §960(a)(3), but they're not included when it comes to granting credits under §960(a)(1) or if taxpayers might get some other benefit (such as losses from currency changes).

The Agencies' failure to explain these internally inconsistent statements is no mere foot-fault; it goes to the heart of the problem—Offset Earnings were never actually included in income under §951(a), nor were they "treated" as included for any purpose other than applying §959. Consequently, §960(a)(1) did not apply. But because §965(b)(4)(A) classified the Offset Earnings as previously taxed income under §959, foreign taxes paid on the earnings were creditable under §960(a)(3). Treasury's admission that Offset Earnings are not actually included in income is a

---

83 Fed. Reg. at 39537. Section 986(c) generally requires taxpayers to recognize foreign-currency gain or loss on distributions of previously taxed income based on the difference in exchange rates from the time of the deemed and actual distribution.

concession that the Final Rule rests on a faulty premise.

## V. Congress Did Not Disallow Hundreds of Millions of Dollars of Credits by Obscure Implication.

The Agencies' atextual regulation creates a mammoth disallowance of more than $230 million of foreign tax credits for FedEx alone (not to mention hundreds of millions of dollars for other taxpayers). Pourciaux Decl. ¶28, Ex. 2. But Congress cannot be presumed to have explicitly disallowed hundreds of millions of dollars of credits in the TCJA provisions that directly address foreign tax credits only to then obliquely disallow hundreds of millions more in §965(b)(4)(A)—a statute that doesn't even use the term. No, if Congress had intended to grant the sweeping powers that the Final Rule purports to exercise, it would have done so expressly—as it did in §§965(g) and 245A(d), which for FedEx disallowed credits amounting to $115 million and $198 million, respectively. Pourciaux Decl. ¶¶16, 18, Ex. 2. Congress did not authorize the disallowance of another $230 million in credits through "modest words, vague terms, or subtle devices," nor did it use "oblique or elliptical language" in §965(b)(4)(A) to empower the Agencies to make a "radical or fundamental change" to the Code's foreign-tax-credit provisions. *West Virginia v. EPA*, 2022 U.S. LEXIS 3268, at *38 (June 30, 2022); *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (Kavanaugh, J.). In short, "Congress doesn't hide regulatory elephants … in mouseholes." *Nat'l Wildlife Fed'n*, 960 F.3d at 879 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). And the Agencies' argument here is "all elephant and no mousehole." *Gulf Fishermens Ass'n v. NMFS*, 968 F.3d 454, 462 (5th Cir. 2020).

## CONCLUSION

Based on the foregoing, this Court should conclude that the Final Rule is invalid, and Plaintiff respectfully requests that the Court grant its Motion for Partial Summary Judgment.

Respectfully submitted,

Richard R. Roberts
Peter D. Blumberg
FedEx Express
3620 Hacks Cross Road
Building B, 3rd Floor
Memphis, TN 38125
Tel:    (901) 434-8489
richard.r.roberts@fedex.com
peter.blumberg@fedex.com

*s/ Joseph B. Judkins*
Joseph B. Judkins
Tennessee BPR No. 033183
George M. Clarke
Cameron C. Reilly
Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC  20006
Tel:    (202) 452-7000
joseph.judkins@bakermckenzie.com
george.clarke@bakermckenzie.com
cameron.reilly@bakermckenzie.com

Attorneys for Plaintiff, FedEx

Dated:  July 25, 2022

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 25, 2022, I served a copy of the foregoing document by filing it through the Court's electronic filing (CM/ECF) system, which will send an electronic copy to all counsel of record.

*s/ Joseph B. Judkins*
JOSEPH B. JUDKINS
Attorney for Plaintiff, FedEx
