# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

FEDEX CORPORATION  )
and SUBSIDIARIES  )
   )
   )
     Plaintiff,  )
   )
     v.  )     Case No. 2:20-CV-02794
   )
UNITED STATES OF AMERICA,  )
   )
     The United States.  )
_____)

_____

## UNITED STATES' MEMORANDUM IN SUPPORTOF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN RESPONSE TO FEDEX'S MOTION FOR PARITAL SUMMARY JUDGMENT

_____

DAVID A. HUBBERT
Deputy Assistant Attorney General

CORY A. JOHNSON
Ill. Bar No. 6211233
Senior Litigation Counsel
JAN M. GEHT
Special Trial Attorney
ELISABETH M. BRUCE
ROBERT J. ATRAS
Trial Attorneys
U.S. Department of Justice (Tax Division)
P.O. Box 227, Ben Franklin Station
Washington, D.C. 20044
202-307-3046 (Johnson)
651-361-1823 (Geht)
202-598-0969 (Bruce)
202-598-3738 (Atras)
Cory.A.Johnson@usdoj.gov
Jan.M.Geht@irscounsel.treas.gov
Elisabeth.M.Bruce@usdoj.gov
Robert.J.Atras@usdoj.gov

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................1

BACKGROUND .................................................................................................1

ARGUMENT .......................................................................................................2

   I.  THE PURPOSE OF THE FOREIGN TAX CREDIT RULES
      MITIGATION OF DOUBLE TAXATION................................................2

      A.  The Pre-TCJA Rules ...................................................................2

      B.  The TCJA and the § 965 Transition Tax ..................................5

      C.  The TCJA's Foreign Tax Credit Rules .....................................8

   II. SECTION 965 PRECLUDES FEDEX'S CLAIM FOR ADDITIONAL
      FOREIGN TAX CREDITS ON UNTAXED OFFSET EARNINGS.........10

      A.  Section 965(b)(4)(A)..................................................................10

      B.  Fitting § 965 Into the Unified Foreign Tax Credit Scheme ...............12

      C.  The Result: The Statutory Provisions Do Not Allow Credits for
      Foreign Taxes on Offset Earnings ..........................................18

   III. TREASURY REGULATION § 1.965-5(c)(1)(ii) IS VALID AND
      ENFORCEABLE.....................................................................................19

      A.  FedEx Concedes that the Regulation Bars Its Claim .............19

      B.  FedEx's *Chevron* Challenge Fails .........................................20

        1. Step One: The Statutory Provisions Preclude FedEx's Claim,
        and the Regulation Does the Same.....................................20

        2. Step Two: The Regulation is a Permissible Construction of
        the Statute .............................................................................22

      C.  Treasury Focused Fully on the Issues and There Was No Failure
      to Respond to Comments .........................................................24

   IV. FEDEX'S COMPLAINTS ABOUT DISALLOWED CREDITS AND
      CAPITAL GAINS DO NOT CHANGE ANYTHING...............................28

CONCLUSION.....................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Air Trans. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
   791 F. Supp. 2d 26 (D.D.C. 2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011) ........................26

*Alliance for Cmty. Media v. F.C.C.*,
   529 F.3d 763 (6th Cir. 2008) ........................................................................................21

*Am. Chicle Co. v. U.S.*,
   316 U.S. 450 (1942) .......................................................................................................5

*Am. Great Lakes Ports Ass'n v. Zukunft*,
   296 F. Supp. 3d 27 (D.D.C. 2017) .................................................................................26

*Audio Technica U.S., Inc. v. United States*,
   963 F.3d 569 (6th Cir. 2020) ........................................................................................21

*Burnet v. Chicago Portrait Co.*,
   285 U.S. 1 (1932) ...........................................................................................................5

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .............................................................................................. *passim*

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) .....................................................................................................20

*R. H. Donnelley Corp. v. United States*,
   641 F.3d 70 (4th Cir. 2011) .....................................................................................10, 14

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ......................................................................................................10

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
   140 S.Ct. 2367 (2020) ..............................................................................................12, 24

*Long Island Care at Home, v. Coke*,
   551 U.S. 158 (2007) ......................................................................................................27

*Mayo Found. for Med. Educ. and Rsch. et al. v. United States*,
   562 U.S. 44 (2011) ........................................................................................................22

*Moore v. United States*,
   36 F.4th 930 (9th Cir. 2022) ...........................................................................................5

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases (Continuation):**

*National Cable & Telecomms. Assoc. v. Brand X Internet Servs. et al.*,
  545 U.S. 967 (2005)............................................................................................22

*Nichols v. United States*,
  260 F.3d 637 (6th Cir. 2001) ...........................................................................23

*Oakbrook Land Holdings, LLC v. Commissioner*,
  28 F.4th 700 (6th Cir. 2022) ...........................................................22, 23, 24, 25

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)............................................................................................24

*Redlark v. Commissioner*,
  141 F.3d 936 (9th Cir. 1998) ...........................................................................24

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997)..........................................................................................21

*Sierra Club v. U.S. E.P.A.*,
  793 F.3d 656 (6th Cir. 2015), *cert. denied*, 136 S.Ct. 1491 (2016)................21

*Silver v. Internal Revenue Service*,
  531 F.Supp.3d 346 (2021) ..................................................................................6

*Thompson v. Clark*,
  741 F.2d 401 (D.C. Cir. 1984)..........................................................................26

*U.S. Satellite Broad. Co., Inc. v. FCC*,
  740 F.2d 1177,1188 (D.C. Cir. 1984)...............................................................25

*U.S. v. Goodyear Tire and Rubber Co.*,
  493 U.S. 132 (1989).........................................................................................4, 5

*Whirlpool Fin. Corp. v. Commissioner*,
  19 F.4th 944 (6th Cir. 2021) .............................................................11, 14, 19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Statutes:**

5 U.S.C. § 553 .............................................................................................24

5 U.S.C. § 706(2) ........................................................................................25

Internal Revenue Code of 1986 (26 U.S.C.):

  §61 ..........................................................................................................2

  §78 .....................................................................................................3, 14

  §245A ............................................................................................... *passim*

  §636 ........................................................................................................11

  §901 ..........................................................................................................3

  §902 ................................................................................................. *passim*

  §904 ..........................................................................................................5

  §§951-964 ........................................................................................ *passim*

  § 965 ................................................................................................ *passim*

  §7805 ......................................................................................................19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Other Authorities:**

Federal Register:

    83 F.R. 39514-01 (2018)................................................................23, 25, 27

    84 F.R. 1838-01 (2019)................................................................20, 25, 27

H.R. Rep. No. 87-1447 (1962)...........................................................4, 14

H.R. Rep. No. 115-409 (2017)..........................................................6, 7, 8,9

H.R. Rep. No. 115-466 (2017)................................................................6

S. Rep. 87-1881 (1962).......................................................................14

Staff of J. Comm. On Tax'n, General Explanation of Public Law 115-97
    (JCS-1-18)...........................................................................8, 9, 24

Treasury Regulation (26 C.F.R.):

    § 1.636-3 ...........................................................................11

    § 1.902-1 ...........................................................................3, 13

    § 1.965-2 ...........................................................................7,8

    § 1.965-5 ............................................................................. *passim*

"Bittker & Lokken, *Fundamentals of International Taxation* (2002) .....................................14

## INTRODUCTION

FedEx is right that the Internal Revenue Code's international rules are complex. But it is flat wrong that those rules allow its foreign tax credit claim in Count II of its Complaint. The statutory provisions alone preclude its claim, and the applicable regulation slams the door shut. This Court should grant partial summary judgment in favor of the United States, and it can do so relying solely on the statutory provisions or, alternatively, by rejecting FedEx's contention that Treasury Regulation § 1.965-5(c)(1)(ii) is invalid.

## BACKGROUND

FedEx filed this case before its scheduled IRS audit had even begun. The audit of the tax years at issue in this case is now underway. In its Complaint, FedEx challenges the validity of a tax regulation, promulgated after the enactment of the Tax Cuts and Jobs Act ("TCJA") in 2017, P.L. 115-97, 131 Stat. 2054, 2225 (Dec. 22, 2017), and argues that the statutory provisions otherwise allow it to claim credits for foreign taxes related to foreign earnings that bear no U.S. tax.

After a period of discovery, the parties stipulated to certain facts that provide a basis for the Court to address some threshold legal issues. For example, the parties stipulated that FedEx's foreign subsidiaries distributed "some amount of earnings and profits referred to in section 965(b)" and that a "certain amount of foreign taxes was paid or accrued on the earnings and profits referred to in section 965(b)." (ECF No. 42-1, ¶¶ 22-23).

The parties have disagreements about the amount and character of some of the distributions and relevant taxes, but the parties have agreed to address those issues, if necessary, after the Court decides the cross-motions for partial summary judgment. (ECF No. 42-1, ¶ 25). Resolution of any such disputes may not be necessary: FedEx has stipulated that if the Court

grants the United States' motion, FedEx is not entitled to a refund of any amount under Count II of its Complaint. (ECF No. 42-1, ¶ 26).

Because of the parties' stipulations and the legal issues presented by the parties' cross-motions, we are not addressing now FedEx's background discussion of the specific value of the distributions it engaged in or the foreign taxes it paid. Similarly, we are not addressing the specific transactions and figures in the affidavit FedEx submitted. Indeed, consistent with the parties' stipulations, FedEx did not set out any of these matters in a statement of undisputed facts that would require a response.

Based on the parties' stipulations, however, threshold legal issues regarding Count II are ripe for the Court's consideration.[1]

ARGUMENT

We begin with some background about the Code's foreign tax credit rules.

## I.  THE PURPOSE OF THE FOREIGN TAX CREDIT RULES: <u>MITIGATION OF DOUBLE TAXATION</u>

### A.  The Pre-TCJA Rules

The United States has historically taxed its citizens and residents, including corporations, on income from whatever source derived (*i.e.*, both foreign and U.S. source). § 61(a).[2] This "worldwide taxation" approach creates the potential for "double taxation" of foreign source income: where a U.S. taxpayer pays taxes to a foreign country on income and then also pays

---

[1] Neither party has moved for partial summary judgment on Count I of the FedEx's Complaint. FedEx contends that any refund under Count I is *not* dependent on its foreign tax credit claim or the validity the of Treas. Reg. § 1.965-5(c)(1)(ii).

[2] All statutory citations are to 26 U.S.C. All regulation cites are to 26 C.F.R.

taxes to the United States on the same income. (Because this case concerns FedEx, we will focus on the rules applicable to corporations.)

To alleviate this problem, the United States allows in certain circumstances a "foreign tax credit," that is, a credit against U.S. income tax liability for income taxes paid to a foreign country. Prior to the enactment of the TCJA, there were three principal scenarios in which credits were allowed. First, a U.S. corporation could claim a credit for foreign income taxes imposed on income earned directly by the corporation. For example, a U.S. corporation that operated in a foreign country through a branch and paid foreign income taxes to that foreign country on income derived through that branch's operations could be eligible to claim a "direct credit" against its U.S. income tax liability under § 901.

Second, a U.S. corporation that operated abroad through a foreign subsidiary could claim an "indirect credit" when it received a dividend from the subsidiary. The U.S. shareholder is taxed on the dividend but is also treated as having paid the same proportion of the foreign income taxes paid by the subsidiary as the amount of the dividend bore to the subsidiary's previously untaxed earnings. § 902 (2016) (repealed 2017).[3]

When a U.S. shareholder claimed an indirect credit, it was also required to include in its taxable income an amount equal to the credit. § 78. This inclusion, or "gross-up," is necessary to prevent the effective allowance of both a deduction and a credit for the foreign income taxes paid

---

[3] For purposes of computing the taxes deemed paid, taxpayers had to keep track of a foreign corporation's post-1986 undistributed earnings and post-1986 foreign income taxes. Treas. Reg. § 1.902-1(a)(8), (9). When earnings were distributed as a dividend and taxes deemed paid, such earnings and taxes would be removed from post-1986 undistributed earnings and post-1986 foreign income taxes, respectively, whether or not a credit was actually claimed. The TCJA repealed § 902 for tax years beginning after December 31, 2017. For subsequent taxable years, taxpayers are eligible to claim deemed paid credits under § 960 for the foreign taxes attributable to specific types of income required to be included annually. The new regime eliminated the need to maintain accounts of historical earnings and taxes in computing deemed paid credits.

by the foreign subsidiary that reduced the subsidiary's earnings; the gross-up mechanism essentially puts the shareholder in the same position as if it had engaged in the offshore activity directly.  This indirect credit was intended to "equalize treatment between domestic corporations that operate through foreign subsidiaries and those that operate through unincorporated foreign branches."  *U.S. v. Goodyear Tire and Rubber Co.*, 493 U.S. 132, 135, 140 (1989).

A third credit scenario arose when Congress added "Subpart F" to the Code in 1962. §§ 951 – 964 (2016). Prior to the enactment of Subpart F, a U.S. shareholder only paid U.S. tax on its foreign subsidiary's earnings when distributions were made, which allowed for deferral of U.S. tax.  H.R. Rep. No. 87-1447, at 57 (1962). Under Subpart F, which is still in place after the TCJA, certain types of income ("Subpart F income")—such as interest, dividends, and certain sales income—of a controlled foreign corporation ("CFC") are included in the taxable income of a U.S. shareholder even though not distributed. § 951. When the U.S. shareholder includes in gross income a CFC's Subpart F income, the U.S. shareholder is also deemed to pay a portion of the foreign income taxes paid by the CFC "*as if* the amount so included [in its gross income] were a dividend" for purposes of the § 902 indirect credit.[4] § 960(a)(1). This allows the U.S. shareholder to claim an indirect credit for the foreign income taxes paid by a CFC in the same year the CFC's income is taxed in the United States. When the CFC actually distributes amounts previously included in a U.S. shareholder's gross income as Subpart F income, such distributions are not included again in the U.S. shareholder's taxable income and the U.S. shareholder may not claim a credit again for taxes previously deemed paid. §§ 959(a), 960(a)(2).

---

[4] This is one example of the Code relying on related provisions and attaching real consequences to a hypothetical.

In each of these scenarios, the foreign tax credit serves a fundamental purpose: to "mitigate the evil of double taxation." *Burnet v. Chicago Portrait Co*., 285 U.S. 1, 277 (1932). *See also Goodyear Tire*, *supra*; *Am. Chicle Co. v. U.S.*, 316 U.S. 450 (1942). This purpose explains why foreign tax credits are available when and to the extent that a U.S. taxpayer earns income that is taxed abroad and by the United States.

For example, if creditable foreign taxes are less than the U.S. corporation's U.S. income tax liability, the U.S. corporation would still owe some U.S. tax after a credit – with respect to that additional amount there is no double tax to eliminate. Similarly, as the above scenarios demonstrate, a credit is generally intended for situations where there is a U.S. tax as well as a foreign tax – a potential double tax situation. Finally, the rules place a ceiling on the amount of credits that may be claimed such that the credit for foreign income taxes may not exceed the U.S. tax (before credit) on income from foreign sources. § 904 (2016) (amended 2017). If there were no upper limits, the credits would shelter unrelated income from tax and the U.S. Treasury would effectively subsidize the payment of higher foreign taxes rather than eliminate double taxation.

### B.      The TCJA and the § 965 Transition Tax

The TCJA changed some of the international tax rules. With some exceptions, the new provisions moved the United States away from worldwide taxation and towards a "territorial tax system." *See, e.g.*, *Moore v. United States*, 36 F.4th 930, 938 (9th Cir. 2022). But the new rules, in combination with some still-applicable old rules, continue to disallow FedEx's credit claim, consistent with the long-standing purpose of the credit rules.

The addition of § 245A to the Code was the principal change towards a territorial system. It provides that when a domestic corporation, which qualifies as a "U.S. shareholder" of a "specified 10-percent owned foreign corporation," receives a dividend from that foreign

corporation, it is entitled to a deduction equal to the "foreign-source portion of such dividend." § 245A(a). In other words, a U.S. shareholder is not subject to U.S. tax on the foreign source portion of the dividend income because the deduction eliminates such dividend income from taxable income.[5]

When considering whether to tax foreign source dividend income, Congress was aware that many international companies "have accumulated significant untaxed and undistributed foreign earnings…" in their foreign subsidiaries (generally, those earnings not repatriated and not included under Subpart F). H.R. Rep. No. 115-409 at 375. By itself, § 245A would have allowed foreign subsidiaries to distribute tax-free trillions of dollars of accumulated earnings and the U.S. shareholders to escape U.S. tax they would have otherwise owed.

To avoid a "windfall for corporations that deferred income, and to ensure that all distributions from foreign subsidiaries are treated in the same manner under the participation exemption system," Congress adopted § 965. *Id*. Section 965 is meant to "clear the decks" going forward for § 245A and the new territorial rules by imposing a one-time "transition" tax on the deferred income. Tax Management Portfolio 926-3rd, CFCs—General Overview, Sec. II.C.17. It did so by increasing Subpart F income of certain foreign subsidiaries ("deferred foreign income corporations" ("DFICs")) by the greater of the undistributed "accumulated post-1986 deferred foreign income" as of two 2017 measurement dates. § 965(a); *Silver v. Internal Revenue Service*, 531 F.Supp.3d 346, 351-52; H.R. Rep. No. 115-409 at 375-76 (2017); H.R. Rep. No. 115-466 (2017) (The mechanism for requiring an inclusion of pre-effective-date foreign earnings is

---

[5] With respect to a U.S. corporation, the § 245A deduction only applies to distributions sourced out of untaxed earnings of a foreign corporation. It does not apply to distributions of earnings previously included by the U.S. shareholder as Subpart F income inclusions.

Subpart F.).  A U.S. shareholder is required to increase its taxable income "without requiring an actual distribution of earnings."  H.R. Rep. No. 115-409 at 375.

In determining the increased Subpart F income, § 965(b) allows the "aggregate foreign E&P [*i.e.*, earnings and profits] deficit" of certain foreign subsidiaries ("E&P deficit foreign corporations") to be allocated to reduce the amount of accumulated earnings to be included in a U.S. shareholder's income pursuant to § 965(a)(1) from each of its DFICs. For example, if a U.S. shareholder wholly owns two foreign subsidiaries, Company A, a DFIC, with $100 of accumulated untaxed earnings and Company B, an E&P deficit foreign corporation, with a "specified E&P deficit" of $30, under § 965, the U.S. shareholder's Subpart F income from Company A will be increased by only $70.

The increased Subpart F income ("§ 965(a) inclusion") is then taxed at reduced rates, with one reduced rate (15.5% instead of 35%) for earnings held as cash and another even lower rate (8% instead of 35%) for earnings held as non-cash assets. This reduction in rates is achieved through a deduction of an amount that results in the § 965(a) inclusion amount being effectively taxed at the lower rates. § 965(c) ("§ 965(c) deduction"). According to the House Report, Congress adopted the two rates because it wanted to account for the differing "liquidity of the accumulated earnings." H.R. Rep. No. 115-409 at 375.

A DFIC's accumulated post-1986 deferred foreign income that is included in income under § 951(a) by the U.S. shareholder (*i.e.*, the $70 of Company A) is treated as previously taxed E&P described in § 959(c)(2). Treasury Regulations § 1.965-2(c) provides that these earnings are referred to as "§ 965(a) previously taxed earnings and profits" ("§ 965(a) PTEP"). The amount of the DFIC's earnings that is reduced by the aggregate foreign E&P deficit (that is, the $30 of Company A) is treated as an amount which was included in the gross income of the

U.S. shareholder under § 951(a) and as previously taxed E&P described in § 959(c)(2) when

distributed. §965(b)(4). Treasury Regulations § 1.965-2(d) provides that these earnings are

referred to as "§ 965(b) previously taxed earnings and profits" ("§ 965(b) PTEP").  FedEx calls

them "Offset Earnings." Section 959(a) provides that the amounts included in the gross income

of a U.S. shareholder under § 951(a) (which includes § 965(a) PTEP and § 965(b) PTEP) are not,

when distributed to the U.S. shareholder, again included in the gross income of the U.S.

shareholder.

### C.     The TCJA's Foreign Tax Credit Rules

The TCJA also addressed the related foreign tax credits that U.S. shareholders could

claim. The adjustments Congress made reflect the continuing target of the credit: avoiding

double tax.

For tax years beginning before December 31, 2017 (including FedEx's tax year ending

May 31, 2018), the pre-TCJA version of § 960 applies to a § 965(a) inclusion, and a taxpayer

could claim a deemed paid foreign tax credit under § 960(a)(1). P.L. 115-97 § 14301(d)

(effective date for amended § 960). However, to reflect the reduced tax rate for a § 965(a)

inclusion, § 965(g)(1) also reduces the credits that will be allowed.  It disallows a credit for a

certain percentage of the foreign taxes paid or treated as paid "with respect to any amount for

which a deduction is allowed under this section," that is, the § 965(c) deduction. In sum, as the

Joint Committee on Taxation explained, the foreign taxes "attributable to the nontaxed portion of

the deferred foreign income is neither creditable nor deductible." Staff of J. Comm. On Tax'n,

General Explanation of Public Law 115-97, at 362 (JCS-1-18). S*ee also* H.R. Rep. No. 115-409

at 379-80 (2017). With a reduced potential for double tax on the § 965(a) inclusion—because of the reduced tax rate—the availability of credits is reduced.[6]

Similarly, going forward, § 245A(d) disallows credits for foreign taxes paid or treated as paid on the foreign-source portion of a dividend from a foreign subsidiary. Once again, with the potential for double tax eliminated (no U.S. tax on the foreign source portion of future distributions), Congress recognized there is no reason for a credit. *See, e.g.*, JCS-1-18 at 350.

The rules for credits that could be claimed from Subpart F income inclusions after the transition year were also changed. Reflecting the intent to clear the decks, § 960 was amended to provide that the taxes that would be deemed paid would be determined on a current year basis, rather than by reference to post-1986 accounts for accumulated earnings and foreign taxes. § 960(a) (2017); *See, e.g.*, H.R. Rep. No. 115-409, 383 (2017); Tax Management Portfolio, 6200-1st, CFC's—General Overview, Sec. 17(d). Indeed, accumulated post-1986 deferred earnings were included or treated as included in a U.S. shareholder's income per § 965 and the associated post-1986 foreign income taxes deemed paid under the pre-TCJA version of §960, in any event.

These adjustments that Congress made provide context for FedEx's bold claims in this case. FedEx argues that Congress did not address the availability of foreign tax credits when a taxpayer receives a distribution of Offset Earnings from a foreign subsidiary free of any U.S. tax (in the above example, the $30 of Company's A's accumulated earnings). Relying on an incomplete selection of words in the statute, FedEx thus contends that Congress unambiguously intended to not only exempt those Offset Earnings from U.S. tax but also provide a foreign tax

---

[6] FedEx (at 10) misinterprets a statement in the legislative history about § 965(g). The statement refers to the credits allowed in connection with a § 965(a) inclusion, not taxes deemed paid on Offset Earnings. H.R. Rep. 115-409, p. 380 n. 952.

credit so that the United States would effectively reimburse FedEx for foreign taxes paid. That is not the mitigation of double tax; it is the elimination of any tax.

Congress could have provided such a windfall. As we demonstrate below, *it did not*.

Section § 965(b)(4)(A) mandates a treatment for Offset Earnings that precludes a claim for foreign tax credits. That approach is different than the two TJCA foreign tax credit provisions discussed above, but it is no less effective. And the result is not surprising: double tax is avoided. FedEx pays no U.S. tax on Offset Earnings but is not reimbursed for its foreign tax on those earnings through a credit either. We turn to that statutory text.

## II.   SECTION 965 PRECLUDES FEDEX'S CLAIM FOR ADDITIONAL FOREIGN TAX CREDITS ON UNTAXED OFFSET EARNINGS

It is a "fundamental cannon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). That careful approach is particularly important for the Code's "unified statutory scheme" governing foreign tax credits. *R.H. Donnelley Corp. v. United States,* 641 F.3d 70, 76 (4th Cir. 2011). Amidst all the rhetoric of its motion, FedEx fails to give effect to the terms of § 965(b)(4)(A) and its links to related provisions.

### A.   Section 965(b)(4)(A)

As noted above, the amount of a U.S. shareholder's § 965(a) inclusion with respect to a DFIC's income is reduced by the aggregate foreign E&P deficit. Congress expressly addressed how those Offset Earnings shielded from the transition tax would be treated if distributed to a U.S. shareholder in § 965(b)(4)(A):

> Reduced Earnings and Profits Treated As Previously Taxed
> Income When Distributed—For purposes of applying section 959
> in any taxable year beginning with the taxable year described in

10

> subsection (a), with respect to any United States shareholder of a
> deferred foreign income corporation, an amount equal to such
> shareholder's reduction under [965(b)(1)] which is allocated to
> such deferred foreign income corporation under [965(b)] shall be
> treated as an amount which was included in the gross income of
> such United States shareholder under section 951(a).

This provision clearly has a technical meaning that depends on application of other specialized rules. *Whirlpool Fin. Corp. v. Commissioner*, 19 F.4th 944, 950 (6th Cir. 2021) ("when a statute, like this one, is 'addressing a technical subject, a specialized meaning is to be expected'"). But before following this provision's directions to other Code sections we address a few preliminary points.

First, the determination that a foreign subsidiary's Offset Earnings would be treated as previously included in income makes perfect sense. That foreign subsidiary also would have accumulated earnings actually included in income and taxed under § 951 because of its U.S. shareholder's § 965(a) inclusion. Things are therefore simplified with respect to both types of accumulated earnings: all repatriation distributions would be of earnings previously included in income or treated as previously included with no U.S. tax owed and no reason to search historical foreign tax accounts for available credits. The decks have been cleared for the new territorial system to apply.

Second, like many Code provisions, § 965(b)(4)(A) prescribes *a treatment* that is based on a hypothetical. In tax law, there is nothing unusual about that, FedEx's mistaken musings about Schrodinger's cat notwithstanding. *See, e.g*., § 960(a)(1) (2016) ("section 902 shall be applied *as if*…." Emphasis added.); § 636(a) and Treas. Reg. § 1.636-3(a) (A "production payment" that is an economic interest "shall be treated" as a loan and as not being an economic interest in certain circumstances.). This approach is an efficient way to adopt well-understood results for a new situation. FedEx merely points out a given when it notes that Offset Earnings

11

were not actually previously included in income and taxed under § 951(a). The issue at hand is what is the consequence of the mandated counterfactual *treatment* that they were.

Third, FedEx makes much of § 965(b)(4)(A) beginning with the phrase, "For the purposes of applying section 959…." Betraying a lack of faith in the conclusions it wants to draw from that, FedEx feels compelled to always add the modifier "only" or "solely" before that phrase in its briefing.  (FedEx Memo pp. 2, 3, 6, 16, 20). *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2381 (2020) ("By introducing a limitation not found in the statute, respondents ask us to alter, rather than to interpret" it.). Here FedEx's sleight of hand fails for more substantial reasons, as we discuss below.[7]

### B.    Fitting § 965 Into the Unified Foreign Tax Credit Scheme[8]

The principal problem with FedEx's arguments is that it wants to *treat* its Offset Earnings as having been included in gross income under § 951 when applying § 959 in some situations but not others. For purposes of excluding the Offset Earnings from its gross income—and thus from U.S. tax—it agrees that we should treat the Offset Earnings as amounts which were previously included in gross income under § 951. § 959(a). For purposes of claiming foreign tax credits under § 960(a)(3), however, FedEx wants to skip treating the earnings as having been included in gross income under § 951. As it confusingly argues (at 17): "By invoking § 959 (and explicitly not § 951(a)), Congress drew a direct line from § 965(b)(4)(A) to § 960(a)(3) (which expressly references § 959), thereby providing a credit for foreign taxes paid on Offset Earnings."

---

[7] Additionally, *Ingersoll-Rand* is irrelevant. That case concerned a provision from the Deficit Reduction Act of 1984 not applicable here. (No. 3:16-cv.289 (W.D. N.C.); Complaint, ¶ 18, ECF No. 1). After a split oral ruling from the bench (in which the court found the taxpayer's transactions to be a sham), the case was settled before appeal. (ECF No. 53).

[8] The pre-TCJA versions of §§ 902, 951, 959 and 960 apply to FedEx's FYE 2018 tax year and refund claim.

Congress *does* expressly invoke § 951 in § 965(b)(4)(A), however. And it did *not* draw a direct line from § 965(b) to § 960(a)(3), which is not mentioned in § 965(b). Congress directed Offset Earnings to be treated as amounts included in gross income under § 951(a), which is the starting point of a set of interlocking, sequential rules.[9]

First, § 960(a)(1) provides that, if there is an amount included in a domestic corporation's gross income under § 951(a), § 902 "shall" be applied as if that amount were a dividend. Section 902(a) then provides that the domestic corporation "shall" be deemed to have paid a portion of the foreign subsidiary's taxes in the ratio of the amount of the § 951(a) inclusion to the foreign corporation's earnings. Section 960(a)(2) further states that those deemed paid taxes "shall not" be taken into account again for purposes of §902 in connection with a subsequent distribution that is excluded from gross income under § 959(a). Section 960(a)(2) contains no qualification for allowance of a credit on a § 959 distribution if a domestic corporation did not previously claim a credit for the deemed paid taxes. Long-standing regulations promulgated in 1997 explain that those foreign taxes that are deemed paid because of a § 951(a) inclusion are removed from the post-1986 foreign income taxes account of the foreign subsidiary. Treas. Reg. § 1.902-1(a)(8)(i). For any distribution examined under § 960(a)(3), therefore, the taxes on the earnings

---

[9] FedEx's numerical example (FedEx Memo pp. 7-9) demonstrates its disregard of the text of the statute. FedEx notes that the $500 of Offset Earnings was not actually included in income and contends that § 965(b)(4)(A) "treats" the $500 as "previously taxed income." That is inaccurate. Per § 965(b)(4)(A), the $500 is "treated as an amount which was included in [] gross income… under section 951(a)." FedEx elides the fact that the Offset Earnings are treated as previously taxed only as a consequence of being *treated* as previously included in income under § 951. Its example is misleading and incomplete because it ignores this.

that were included under § 951(a) have already been deemed paid and are unavailable to be deemed paid and credited again. § 960(a)(2).[10]

Note that each of the consequences that flow from a § 951(a) inclusion is mandatory. Each statutory provision provides what "shall" happen. The end result—*i.e.*, associated foreign taxes deemed paid under § 960(a)(1) whether or not a credit is claimed—is the consequence of explicitly linked statutory provisions.

There is no reason to presume that Congress did not intend for these consequences to hold when it directed that Offset Earnings would be treated as amounts that were included in gross income under § 951(a). *See, e.g.*, *Whirlpool*, 19 F.4th at 950 ("[W]e ask what an appropriately informed speaker of the language would understand that specialized meaning to be."). The only reasonable and consistent implementation of Congress's direction is to follow the statutory commands that Congress set in motion. Amounts treated as previously taxed earnings, because treated as included under § 951(a), must also be treated as amounts for which the related foreign taxes were also previously deemed paid because of that same § 951(a) treatment. To conclude otherwise would "fracture" the statutory scheme. *R.H. Donnelley*, 641 F.3d at 76. The

---

[10] Section 960(a)(3) would apply, however, to taxes imposed by a foreign country upon the *distribution* of Offset Earnings by a lower-tier subsidiary to an upper-tier subsidiary—such taxes would not have been deemed paid when the U.S. shareholder included the earnings of the lower-tier subsidiary in income under § 951(a).  *See* H.R. Rep. No. 87-1447, 66 (1962); S. Rep. 87-1881, 94 (1962) (explaining purpose of § 960(a)(3) is to only allow credits for taxes imposed by the foreign country on what that country sees as a dividend distribution, because taxes on the earnings distributed by the subsidiary would have already been deemed paid under § 960(a)(1)); Bittker & Lokken, *Fundamentals of International Taxation*, ¶ 72.9.7 (2002) (discussing scope of pre-TCJA § 960(a)(3) as covering "subsequently imposed taxes"). This specific scope of § 960(a)(3) is confirmed by a § 78 gross-up not being required for purposes of § 960(a)(3). Because the taxes that are deemed paid under § 960(a)(3) are those that were imposed subsequent to the § 951(a) inclusion (and did not reduce the earnings already included by the U.S. shareholder under § 951(a)), the § 78 gross-up is not needed.

foreign taxes on Offset Earnings therefore cannot be deemed paid again nor a credit claimed when those earnings are distributed to a U.S shareholder. §§ 960(a)(2); 960(a)(3).

FedEx does not—and cannot—dispute the linkages among §§ 902, 951, 959 and 960 outlined above. Instead, FedEx argues that § 965(b)(4)(A)'s *treatment* of Offset Earnings as having been previously included in income under § 951 is ignored for its claim for additional foreign tax credits under § 960(a)(3). For the latter issue, FedEx inconsistently contends that the determining factor is whether the Offset Earnings were *actually* included in income at some point in the past under § 951(a). And, so the theory goes, since they were not actually included, the associated foreign taxes remain available to be credited against U.S. tax liability on unrelated income. FedEx bases this inconsistent approach and attempt to cut short the statutory consequences of treating Offset Earnings as included under § 951(a), on a limiting effect it erroneously ascribes to the introductory phrase "For purposes of applying section 959…" in § 965(b)(4)(A). According to FedEx, this phrase means Offset Earnings are treated as previously included in income only to exclude them from taxable income when repatriated.[11]

FedEx's theory is contradicted by the plain text of § 965(b)(4)(A) and the link between § 959 and § 960(a)(3). The former provision provides that, "For purposes of applying section 959… [Offset Earnings] shall be treated as an amount which was included in the gross income of such United States shareholder under section 951(a)."  It does not say, "Solely for purposes of *excluding* Offset Earnings from income under section 959…."

---

[11] Contrary to FedEx's misrepresentation (at 28), the government's position is not inconsistent and Treas. Reg. § 1.965-5(c)(1)(ii) is *not* premised on § 965(b)(4)(A) providing for an "actual inclusion of income under § 951." As Treasury explained when promulgating the regulation, credits are not allowed because Offset Earnings are *treated* as if they had been previously included under § 951(a), and then consistently following the consequences.

Additionally, in applying § 960(a)(3) to a distribution to determine whether there are any creditable taxes, *§ 959 is necessarily being applied*. Section 959's application to a distribution is the express precondition to § 960(a)(3)'s potential further treatment of that distribution as a dividend for purposes of § 902's indirect credit rules. *See* § 960(a)(3). Thus, § 965(b)(4)(A)'s mandate that Offset Earnings are to be treated as previously included in income under § 951 is applicable when determining whether there are taxes that may be credited under § 960(a)(3). And the consequences outlined above therefore hold: the foreign taxes on the Offset Earnings are treated as previously deemed paid and are unavailable to be deemed paid again. § 960(a)(2).

This textual and structural analysis is consistent with how the interlocked Subpart F provisions work together to mitigate double taxation. Section 960(a)(1) allows a credit to be claimed only when foreign earnings are included in a U.S. shareholder's gross income under § 951(a). And any additional foreign taxes subsequently imposed on a distribution may be claimed as a credit under § 960(a)(3) only when the earnings being distributed have previously been included in gross income. That is, credits are available to mitigate a double tax situation. Section 965(b)(4)(A) fits within this structure by both treating the Offset Earnings as having been previously included in U.S. taxable income *and* the foreign taxes previously deemed paid, FedEx's interpretation, on the other hand, would break apart this relationship, by treating Offset Earnings as exempt from U.S. tax, because treated as previously included in income, but not treating the associated taxes as previously deemed paid, thus allowing credit against its U.S. tax liability on unrelated income.

The difference between the government's approach of consistently following the mandate of § 965(b)(4)(A) and FedEx's inconsistent and incomplete interpretation can be illustrated using

FedEx's simplified numerical example. (FedEx Memo pp. 7 – 9).[12] In that example, a foreign subsidiary had $1000 of accumulated earnings and $250 of foreign taxes paid. A sister foreign subsidiary has a deficit of $500. The $500 deficit is allocated to the first subsidiary and reduces the U.S. Shareholder's taxable § 965(a) inclusion from that first subsidiary to $500. The U.S. Shareholder then may claim a foreign tax credit of $125 because of the $500 inclusion – including half of the foreign earnings in gross income results in half of the foreign taxes being deemed paid. When the $500 of Offset Earnings is actually distributed to the U.S. shareholder, however, the U.S. Shareholder does not include that distribution in gross income because that amount is treated as previously included in income, and the U.S. shareholder may not claim a foreign tax credit because the remaining $125 of foreign taxes are similarly treated as previously deemed paid. The correct result is that half the accumulated foreign income is actually subject to U.S. tax and half of the foreign taxes are creditable. (Under the pre-TCJA rules, there would be a similar parallelism, but the full $1,000 of distributed foreign income would have been included in gross income and all the foreign taxes creditable.)

In contrast, FedEx's incoherent theory is that half the accumulated foreign income ($500) is subject to U.S. tax (as above) but *all* the foreign taxes ($250) are creditable against U.S. tax. According to FedEx, a taxpayer may claim the remaining $125 of foreign taxes when it receives the Offset Earnings tax free. (FedEx Memo pp. 7 – 9). That distorted result is the consequence of FedEx not consistently treating the Offset Earnings as previously included in income per § 965(b)(4)(A).

---

[12] Like FedEx, we ignore the reduced tax rates and reduction of credits on a § 965(a) inclusion. That would not affect the point of the comparison.

C.    **The Result: The Statutory Provisions Do Not Allow Credits for Foreign Taxes on Offset Earnings**

As we have demonstrated, FedEx's Offset Earnings are treated as previously included in gross income under § 951 and the associated taxes treated as previously deemed paid. FedEx's claim for additional foreign tax credits, therefore, fails as a matter of law. The only foreign taxes for which FedEx seeks credits are foreign taxes previously treated as deemed paid and unavailable to be deemed paid again. §§ 960(a)(2); 965(b)(4)(A).

FedEx is not seeking credit for any foreign taxes imposed on the distribution of Offset Earnings – *i.e.*, taxes imposed on a subsequent dividend payment from a lower-tier foreign subsidiary to an upper-tier subsidiary that were not claimed (or treated as claimed) under § 960(a)(1). Such foreign taxes are allowed under §960(a)(3); but they are not at issue in this case.[13]

Finally, FedEx's assertion that Congress should have used language like that in §§ 965(g)(1) and 245A(d) to disallow foreign tax credits on Offset Earnings and that, because it did not, it must have meant to allow such foreign tax credits, misses the mark. Sections 965(g)((1) and 245A(d) address new provisions: the unique reduction in U.S. tax rates on a § 965(a) inclusion and the new deduction for foreign source dividends. It is unsurprising that new language is introduced for these new provisions. In contrast, § 960(a)(2) and (a)(3) already precluded a credit for taxes deemed paid under § 960(a)(1) because of the Offset

---

[13] Treasury Regulation § 1.965-5(c)(1)(ii), which FedEx challenges in this case, similarly provides that a U.S. shareholder may claim credit for foreign taxes incurred on § 965(a) PTEP and § 965(b) PTEP distributions. FedEx admits, however, that if the regulation is valid, its claim for additional credits fails, *i.e.*, its claim is not based on credits for foreign taxes that the regulation allows.

Earnings being treated as previously included in gross income under § 951(a).  There was no need to introduce a new provision.[14]

### III.    TREASURY REGULATION § 1.965-5(c)(1)(ii) IS VALID AND UNFORCEABLE

As demonstrated above, the statutory rules alone preclude FedEx's claim for additional credits relating to Offset Earnings. The regulation is not needed to reach that conclusion. *See, e.g., Whirlpool, supra* (not reaching regulation because statute decisive). Nevertheless, FedEx's claim is also foreclosed by Treasury Regulation § 1.965-5(c)(1)(ii), which more plainly spells out the consequences of the interplay of the relevant statutory provisions. That regulation is valid and enforceable under the two-step analysis set out by the Supreme Court in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

### A.    FedEx Concedes that the Regulation Bars Its Claim

Section 965(o) specifically gives the Treasury Department authority to "prescribe regulations" to "carry out the provisions of [§ 965]" and to "prevent the avoidance of the purposes of [§ 965]." The Code has also long given the Treasury Department general authority to issue "all needful rules and regulations" including those that may be necessary because of an amendment of the Code. § 7805(a).

---

[14] FedEx's observation (at 26) that a "discussion draft" of possible additions to the TCJA was circulated by a congressman also does not support its position. The draft was circulated to give stakeholders an opportunity to provide feedback about possible amendments to "properly reflect the original Congressional intent or that provide clarifications consistent with such intent." (FedEx Ex. 14). The potential new § 965(g)(5) was never enacted. Contrary to FedEx's speculation, this does not mean that *Congress* recognized that a statutory amendment was necessary to disallow credits for taxes paid with respect to Offset Earnings. Moreover, if there was an ambiguity in the statute, the then-recently proposed Treas. Reg. § 1.965-5(c)(1)(ii) filled the gap and expressed that Congressional intent. It is consistent with the proposed statutory clarification. There was then no need for further Congressional action. On the other hand, if Congress had intended to allow credits for taxes on Offset Earnings, the proposed amendment would have been one to overrule the recently proposed regulation. FedEx cites no such proposal.

Treasury Regulation § 1.965-5(c)(1)(ii) was promulgated after notice-and-comment and provides as follows:

> (ii) Foreign income taxes deemed paid under section 960(a)(3) (as in effect on December 21, 2017). Foreign income taxes deemed paid by a domestic corporation under section 960(a)(3) with respect to a distribution of section 965(a) previously taxed earnings and profits or section 965(b) previously taxed earnings and profits include only the foreign income taxes paid or accrued by an upper-tier foreign corporation with respect to a distribution of section 965(a) previously taxed earnings and profits or section 965(b) previously taxed earnings and profits from a lower-tier foreign corporation. No credit is allowed under section 960(a)(3) or any other section for foreign income taxes that would have been deemed paid under section 960(a)(1) with respect to the portion of a section 965(a) earnings amount that is reduced under § 1.965-1(b)(2) or § 1.965-8(b).

*See also* 84 Fed. Reg. 1838-01 (2019) (promulgation of final regulations).

FedEx agrees that the last sentence expressly forecloses its claims here. (Joint St. of Undisputed Facts, ¶ 26). The "portion of a section 965(a) earnings amount that is reduced under § 1.965-1(b)(2)" comprises what FedEx calls Offset Earnings. The regulation disallows credits for the foreign income taxes on those earnings. FedEx is thus forced to challenge the validity of the regulation by contending that Congress unambiguously intended to allow its credit claim and that the regulation is an impermissible effort to overrule that intent. FedEx is wrong.

### B.    FedEx's *Chevron* Challenge Fails

#### 1.    Step One: The Statutory Provisions Preclude FedEx's Claim, and the Regulation Does the Same

Under step one of a *Chevron* analysis, a court asks, "whether Congress has directly spoken to the precise question at issue." *Id*. at 842; *see City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-843. In determining whether the intent of Congress is clear, the courts consider

"the language [of the statute] itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997). *See also Sierra Club v. U.S. E.P.A*., 793 F.3d 656, 665 (6th Cir. 2015), *cert. denied*, 577 U.S. 1234 (2016) (court should use traditional tools of statutory interpretation, including structure of the statute and legislative history).

FedEx's primary argument is that the regulation does not survive step one because the statute purportedly unambiguously requires that its foreign tax credit be allowed. FedEx does not point to any explicit Congressional direction in § 965 or elsewhere, however, that a taxpayer *is* entitled to foreign tax credits on Offset Earnings. *See, e.g.*, *Alliance for Cmty. Media v. F.C.C*., 529 F.3d 763, 776-77 (6th Cir. 2008) ("The initial question under step one of the *Chevron* framework is 'whether Congress has directly spoken to the precise question at issue' by employing precise, unambiguous statutory language" (quoting *Chevron*)). *See also Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 578 (6th Cir. 2020) (tax credits are "matters of legislative grace and are strictly construed in favor of the government."). FedEx's argument that the allowance of its foreign tax credit claim is expressly *required* by the statute has no support.[15]

Additionally, as explained above, using the tools of statutory interpretation, the consequence of fitting § 965 into its statutory context is that credits for foreign taxes on Offset Earnings are *not* available when those earnings are distributed tax free. The related foreign taxes

---

[15] FedEx's flawed argument is also based on assuming an inconsistent approach to the availability of credits by Congress. As discussed above, credits available on a § 965(a) inclusion are reduced in parallel with the reduced tax rates on that inclusion. § 965(g). According to FedEx, however, Congress simultaneously exempted Offset Earnings from all tax yet allowed unlimited related foreign tax credits when Offset Earnings were distributed free of tax. There is nothing in the text, structure, or purpose of the TCJA that suggests such a novel windfall was intended.

are treated as previously deemed paid, and FedEx's contrary arguments are based on an inconsistent and incomplete application of § 965(b)(4)(A) and on ignoring how that provision works together with §§ 951, 959 and 960. We will not repeat that discussion here; but it refutes FedEx's argument that the regulation is "contrary to statute."

The Court may thus stop at *Chevron* step one: FedEx cannot, under the applicable statutory provisions, claim credits for foreign taxes on Offset Earnings. Although the regulation more directly states that identical result, it is simply repeating the effect of § 965(b)(4)(A)'s interaction with its related provisions.

> **2.    Step Two: The Regulation is a Permissible Construction of the <u>Statute</u>**

If the Court were to conclude that the statutory provisions alone do not unambiguously preclude FedEx's claim, the validity of the regulation becomes an issue, because FedEx's contrary step one argument clearly fails. Step two is reached if "the statute is silent or ambiguous with respect to the specific issue…." *Chevron*, 467 U.S. at 843. FedEx makes little effort to develop a separate step two argument, perhaps recognizing that the regulation is valid in that situation and precludes its claim. (FedEx Memo p. 15 n. 12).

Treasury Regulation § 1.965-5(c)(1)(ii) easily satisfies *Chevron* step two. Assuming § 965(b)(4)(A)'s interaction with its related provisions is unclear, the question is then "whether Treasury's interpretation was based on a permissible construction of the statute." *Oakbrook Land Holdings, LLC v. Commissioner*, 28 F.4th 700, 718 (6th Cir. 2022). If so, "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *National Cable & Telecomms. Assoc. v. Brand X Internet Servs. et al*., 545 U.S. 967, 980 (2005). *See also Mayo Found. for Med. Educ. and Rsch. et al. v. United States*, 562 U.S. 44, 56-57 (2011) ("Filling gaps

in the Internal Revenue Code plainly requires the Treasury Department to make interpretive choices for statutory implementation at least as complex as the ones other agencies must make in administering their statutes.").

The preamble to the final regulations cogently sets out why Treasury Regulation § 1.965-5(c)(1)(ii) is a reasonable interpretation of § 965(b)(4)(A). For example, in response to a comment, Treasury noted that the purpose of foreign tax credits is to mitigate double taxation and a credit for foreign taxes on Offset Earnings is not necessary to avoid double taxation. Offset earnings will not be taxed by the U.S. when repatriated. 84 Fed. Reg. 1838-01, 1857 (2019). *See, e.g.*, *Chevron*, 467 U.S. at 845 (a court should "not disturb" an agency's determination unless it "appears from the statute or its legislative history" that it "is not one that Congress would have sanctioned."). And Treasury's decision is not impermissible simply because Congress chose to limit credits in *other* situations by other means. *See Nichols v. United States*, 260 F.3d 637 (6th Cir. 2001) (statute's express limitation on loss carrybacks in one context did not preclude tax regulations from prohibiting carrybacks in another).

More importantly, as a technical matter of statutory interpretation, Treasury recognized that § 965(b)(4)(A) explicitly says that Offset Earnings will be "treated as an amount which was included in [] gross income [] under section 951(a)." It is reasonable to conclude that that invocation of a specific part of Subpart F was purposeful and to conclude that there is no basis to ignore the known consequences of that treatment under the applicable rules. *See, e.g.*, *Oakbrook*, 28 F.4th at 719 (whether agency's interpretation is reasonable depends on the "fit" within statutory language and "conformity to statutory purposes."). Similarly, it is reasonable to conclude that when Congress stated that the consequences of an inclusion under § 951(a) would hold for purposes of applying § 959, it meant whenever § 959 was being applied or was a

precondition for another rule, including § 960(a)(3). Treasury explained these reasonable conclusions and others in nine detailed paragraphs of the preamble. 84 Fed. Reg. 1838-01, 1857-58. FedEx provides no basis to find that Treasury's conclusions and regulation were unreasonable in the absence of a more direct *contrary* statement by Congress on the issue. *See, e.g.*, *Little Sisters of the Poor*, 140 S.Ct. at 2381 (the "fundamental principle" that "absent provision[s] cannot be supplied by the courts" applies to "imposing limits on an agency's discretion that are not supported by the text.").

In a *Chevron* step two analysis, where a gap is to be filled, the views of Congress's Joint Committee on Taxation also may be relevant to the reasonableness of the regulation. In its explanation of the TCJA, the Committee observed that Congress intended to not permit credits for foreign taxes associated with Offset Earnings. JCS-1-18 at 362. While not legislative history, such post-enactment explanations are "at least instructive as to the reasonableness of an agency's interpretation of a facially ambiguous statute." *Redlark v. Commissioner*, 141 F.3d 936, 941 (9th Cir. 1998).

### C.    Treasury Focused Fully on the Issues and There Was No Failure to Respond to Comments[16]

The Administrative Procedure Act ("APA") provides for a notice-and-comment process for regulations that will have the force of law. 5 U.S.C. § 553. *See also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Oakbrook*, 28 F.4th at 710. An agency must issue a notice of proposed rulemaking, give interested parties an opportunity to submit comments, and include a concise general statement of basis and purpose when it issues the final rules. 5 U.S.C. § 553. Treasury complied with all three of these requirements when it promulgated § 1.965-5(c)(1)(ii).

---

[16] FedEx alleged other procedural problems in its Complaint that it does not raise in its partial summary judgment motion. We will not address those, as FedEx has abandoned them.

*See* 83 Fed. Reg. 39514-01 (2018); 84 Fed. Reg. 1838-01 (2019). There were no procedural failures that would prevent the regulation from being applied in this case. *See, e.g.*, 5 U.S.C. § 706(2).

FedEx's headline (at 26) for this issue is that "Treasury Failed to Respond to Comments That the Final Rule Was Invalid." But its actual argument (at 26-27) is just a rehash of its disagreement with the substance of the regulation. FedEx does not cite any failure of Treasury to respond; it just doesn't like Treasury's response.

In particular, FedEx repeats (at 28) the straw man argument that Treasury based the regulation on the "legal premise that § 965(b)(4)(A) provided for an actual inclusion of income under § 951." As we have shown above, and as is clearly explained in the preamble, that is false. The regulation is based on Offset Earnings being treated as included in gross income under § 951(a) as stated in § 965(b)(4)(A) and following the consequences.

Treasury issued a Notice of Proposed Rulemaking in the Federal Register on August 9, 2018. 83 Fed. Reg. 39514-01 (Aug. 9, 2018). On February 5, 2019, Treasury published the final regulations in the Federal Register, which included a concise general statement of basis and purpose. 84 Fed. Reg. 1838-01 (Feb. 5, 2019). In the intervening period, Treasury received comments about the proposed regulations.

The APA imposes on agencies an obligation to "respond… in a reasoned manner to significant comments received." *U.S. Satellite Broad. Co., Inc. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984). "Significance" is context dependent. Generally, comments that challenge a fundamental premise of the proposed regulations are considered significant. *Oakbrook*, 28 F.4th at 714 (citing *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)).

However, the APA "has never been interpreted to require the agency to respond to every comment, or to analyze every issue or alternative raised by the comments no matter how insubstantial." *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984); *Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 53 (D.D.C. 2017). And an agency need only weigh the suggestions provided by commenters and it is not required to adopt the suggestions. *Air Trans. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 42 (D.D.C. 2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011).

FedEx is patently wrong that Treasury failed to respond to comments that proposed § 1.965-5(c)(1)(ii) should not be included in the final regulations. The preamble (84 F.R. 1838-01, 1857-58) contains numerous responses. We quote some below:

> Comments stated that allowing a deemed paid credit under section 960(a)(3) is necessary to avoid double taxation; however, there is no double taxation associated with section 965(b) previously taxed earnings and profits. The section 965(a) earnings amount offset by an aggregate foreign E&P deficit is excluded from U.S. taxable income and thereby effectively exempted from U.S. tax under section 965(b)(4)(A) and proposed § 1.965-1(b)(2) or proposed § 1.965-8(b).

> \* \* \*

> Comments argue that the plain language of section 965(b)(4)(A) means that section 965(a) earnings amounts offset by an aggregate foreign E&P deficit are treated as income previously included under section 951(a) solely for purposes of applying section 959, and not for purposes of applying section 960(a). However, the application of section 959 is a precondition to the application of section 960(a)(3). The Treasury Department and the IRS have determined that section 960(a)(3) cannot be applied independently of section 959 and that the Act did not change the relationship between these sections. Indeed, the comments recognize the interaction between sections 959 and 960(a)(3) by recommending that a credit be allowed under section 960(a)(3) upon a distribution of section 965(b) previously taxed earnings and profits, which requires treating such amounts as previously taxed E&P for purposes of section 960(a)(3) as well as for purposes of section 959. If the section 965(b) previously taxed earnings and profits are

26

treated as previously taxed E&P excluded from gross income on distribution under section 959(a) in applying section 960(a)(3), it necessarily follows that in applying that same section those amounts are treated as having been included in income under section 951(a) and resulted in foreign taxes deemed paid under section 960(a)(1) as well.

\* \* \*

After consideration of the comments, the Treasury Department and the IRS maintain the rule in the final regulations based upon both the technical analysis of the relevant sections of the Code and the underlying policy. As a result, no credit is allowed under section 960(a)(3) or any other provision of the Code for taxes attributable to section 965(a) earnings amounts offset by an aggregate foreign E&P deficit that would have been deemed paid under section 960(a)(1) had the amounts actually been included in income under section 951(a).

In sum, Treasury directly addressed commenters' contentions regarding § 1.965-5(c)(1)(ii) and gave reasoned explanations for rejecting them. *See, e.g.*, *Long Island Care at Home, v. Coke*, 551 U.S. 158, 165 (2007) ("The Department focused fully upon the matter in question. It gave notice, it proposed regulations, it received public comment, and it issued final regulations in light of that comment."). It cannot seriously be argued that Treasury ignored the comments it received. Treasury modified other parts of the proposed regulations when they were finalized in response to comments. For example, Treasury modified the regulation concerning the election to make to certain basis adjustments with respect to each DFIC and E&P deficit foreign corporation. *See* 83 F.R. 39514-01, 39551; 84 F.R. 1838-01, 1855-56, Treas. Reg. § 1.965-2(f)(2).[17]

---

[17] FedEx's argument (at 17-18) that Treasury disregarded the "netting rules" of § 965(b) is difficult to follow. Nevertheless, it does not undermine the regulation. It is based on a statement that Treasury did not make in the preamble. Treasury did not state that Offset Earnings are treated as included in income under § 951(a) "by virtue of § 965(a)" as FedEx states. (FedEx Memo p. 18). Treasury stated that "*section 965(b)(4)(A)* treats [Offset Earnings] as previously included in income under section 951(a)…." 84 F.R. 1838-01, 1857 (emphasis added).

27

Finally, we note that although FedEx cites several commenters' objections to proposed § 1.965-5(c)(1)(ii), it fails to acknowledge that one commenter (Silicon Valley Tax Directors Group) accepted the position in proposed § 1.965-5(c)(1)(ii) that foreign tax credits on Offset Earnings were not allowed under § 960(a)(3). (Joint Appendix, ECF No. 42-3, p. JA282). *Chevron* step two is not decided by a tally of comments, however; and those with no objection to a regulation rarely write letters.

### IV.   FEDEX'S COMPLAINTS ABOUT DISALLOWED CREDITS AND CAPITAL GAINS DO NOT CHANGE ANYTHING

Read in context and fitted into the overall foreign tax credit scheme, the consequences of § 965(b)(4)(A)'s direction that Offset Earnings shall be treated as included in gross income under § 951(a) are clear. We need not rely on "Obscure Implication" as FedEx (at 30) characterizes it to determine that foreign tax credits on Offset Earnings are not available.

FedEx's contention (at 30) that it will lose $230 million of credits over multiple years is to no avail; that is the point of § 965(b)(4)(A) and Treasury Regulation § 1.965-5(c)(1)(ii). And the flip side of that loss is the benefit of not being taxed on the Offset Earnings when repatriated, which prior to § 965(b)(4)(A) they would have been. In its Complaint (at ¶ 41), FedEx contended that in its 2018 fiscal year alone it received $263 million of tax-free Offset Earnings. It may repatriate more tax-free in future years. This benefit and the corresponding loss of credits are both the result of treating Offset Earnings as having previously been included in gross income under § 951(a).

FedEx's contention (at 25) that it was subject to "double taxation" when it incurred capital gain on a distribution of Offset Earnings in excess of its basis in its stock falls flat. Treasury Regulation § 1.965-2(f)(2) provides a mechanism to avoid such a separate capital gain. It provides for an election allowing a U.S. Shareholder to increase its basis in its stock of a DFIC

in the amount of the subsidiary's Offset Earnings. FedEx was aware of that election but decided not to make the adjustment. (U.S. St. of Undisputed Facts, ¶¶ 1 – 6). If it had, it would not have incurred the capital gain it cites.

FedEx's assertion here (at p. 25 n. 17), that making the election would force a taxpayer to "join in the Agencies' misinterpretation of clear statutory text" is absurd. Making the election does nothing of the sort. It simply allows for an increase in the basis of the stock of a subsidiary. That would not have precluded FedEx from filing this suit. And FedEx would not be agreeing that "§ 965(b)(4)(A) causes Offset Earnings to be included in income under § 951."[18] FedEx is continuing its misrepresentation of Treasury's analysis of § 965 and its related provisions. Per the statutory text and regulation, Offset Earnings are *treated* as having been included in income under § 951. The election is consistent with that treatment.

---

[18] FedEx does not contend that this was the reason it did not make the election. Mr. Pourciaux does not state that in his affidavit, and in his deposition, FedEx asserted attorney-client privilege.

**Conclusion**

For all the reasons above, this Court should grant partial summary judgment against FedEx and in favor of the United States on Count II of FedEx's Complaint. The statutory provisions preclude FedEx's claim for additional foreign tax credits, in any amount, as a matter of law. Additionally, Treasury Regulation § 1.965-5(c)(1)(ii) is valid and FedEx admits that, if so, it is not entitled to the additional credits and the refund it seeks in Count II.

Dated: September 9, 2022

DAVID A. HUBBERT
Deputy Assistant Attorney General

*s/ Cory A. Johnson*
Cory A. Johnson
Ill. Bar No. 6211233
Senior Litigation Counsel
Jan M. Geht
Special Trial Attorney
Robert J. Atras
Elisabeth M. Bruce
Trial Attorneys
Tax Division
U.S. Department of Justice
P.O. Box 14198, Ben Franklin Station
Washington, D.C. 20044
202-307-3046 (Johnson)
651-361-1823 (Geht)
202-598-3738 (Atras)
202-616-1325 (Bruce)
Fax: 202-514-9440
Cory.A.Johnson@usdoj.gov
Jan.M.Geht@irscounsel.treas.gov
Robert.J.Atras@usdoj.gov
Elisabeth.M.Bruce@usdoj.gov